**In re PHOTO PROMOTION ASSOCIATES, INC., Debtor.**

**Bankruptcy No. 84 B 20417.**

United States District Court, S.D. New York.

Jan. 10, 1985.

Orseck, Orseck & Greenberg, Liberty, N.Y., for debtor.

Levin, Weintraub & Crames, New York City, for Zayre Corp.; Richard L. Koral, New York City, of counsel.

## DECISION ON ORDER TO SHOW CAUSE

HOWARD SCHWARTZBERG, District Judge.

What a difference a day makes, laments Zayre Corp., as a creditor of the debtor, Photo Promotion Associates, Inc., because Photo Promotion failed to comply strictly with a post-petition stipulation agreement pursuant to which Photo Promotion was obligated to pay weekly license charges of approximately $25,000 per week, payable by certified check at Zayre's headquarters in Massachusetts on the Wednesday of each week, commencing on November 7, 1984. Instead Photo Promotion was able to make its payments to Zayre only on Thursdays, but never on Wednesdays. Accordingly, when the debtor's check for Wednesday, December 19, 1984 did not arrive by the close of business on that day, Zayre gave orders the next morning, Thursday, December 20, 1984, to all of its stores to remove the debtor's display booths from the premises and gave notice to the debtor that the contract was terminated. The debtor responded with the instant application for an order staying Zayre from terminating the contract and permitting the debtor to continue its photo promotional activities in Zayre's stores.

## FINDINGS OF FACT

1. The debtor, Photo Promotion Associates, Inc. ("PPA"), filed with this court a petition for reorganization under Chapter 11 of the Bankruptcy Code on October 3, 1984. It has remained in possession of its property and operates its business under 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code.

2. PPA promotes and sells family photo portrait services from booths in department stores and shopping centers. PPA operates under license agreements with the department stores and shopping center locations which enable PPA to set up the booths at the stores on a rotating basis.

3. Zayre Corp. ("Zayre") is a department store chain with approximately 275 stores and is one of PPA's major locations. Zayre is also a creditor of PPA on account of past-due rentals or license fees, which amounted to approximately $510,000 as of the commencement of this case.

4. Pursuant to a show cause order dated October 16, 1984, Zayre sought relief from the automatic stay imposed under 11 U.S.C. § 362 in order to enable Zayre to cancel all sales promotion efforts that PPA scheduled to take place at Zayre's stores and to discontinue any further operating relationship between the parties. The original license agreement between PPA and Zayre expired on July 31, 1984. Thereafter, the parties continued to operate as if the expired agreement were still in effect, during which time negotiations proceeded towards a new licensing agreement.

5. On October 29, 1984, the parties entered into a written stipulation which was approved by this court, in which it was expressed that "PPA believes that continued operations within the Zayre stores are vital to its reorganization efforts and moreover, that it can, during the pendency of the reorganization case under chapter 11, meet all the obligations under the prior agreement, as modified herein ...."

6. It was further stipulated and agreed that "PPA may continue to promote and sell photographic portraiture within the Zayre stores for a term commencing November 1, 1984 and ending October 31, 1985 (the 'New Term') under the same terms as the Agreement ... except as ... modified in part by the terms of the ... Stipulation." It was also agreed that for the 29 days from the commencement of the Chapter 11 case, PPA would pay Zayre a use and occupancy fee of $87,397.26, no later than October 31, 1984. Additionally, it was stipulated and agreed as follows:

For the period of the New Term, PPA shall pay Zayre the fixed license charge of $1,320,000 in fifty-two (52) equal weekly installments each in the sum of $25,384.62 payable at Zayre Corp. headquarters in Framingham, Massachusetts, Attention: Allyn Brockman, by *certified check* on Wednesday, November 7, 1984 and on *each and every Wednesday* thereafter until October 30, 1985.

(emphasis added).

7. PPA paid to Zayre the use and occupancy fee of $87,397.26 and six weekly payments of $25,384.62 before Wednesday, December 19, 1984, for a total of $239,-704.98. However, the weekly payments were made on Thursdays and not on Wednesdays as required by the stipulation agreement.

8. The first weekly license payment under the stipulation was due from PPA on Wednesday, November 7, 1984. However, PPA's vice president called Zayre's office on that day and informed Zayre that the payment was sent by express mail and would arrive at Zayre's office on Thursday, November 8, 1984, which it did. Zayre's representative reminded PPA that the check was due on Wednesday and not Thursday. However, the second payment, which was due on Wednesday, November 14, 1984, was personally delivered by a vice president of PPA who took an airplane to Boston on Thursday, November 15, 1984, where he was met by a representative of Zayre to whom he delivered the check. The third payment from PPA was due on

Wednesday, November 21, 1984, the day before Thanksgiving. Once again PPA's vice president advised Zayre's representative that the check would be sent by express mail. Zayre's representative objected, saying that Zayre's office was closed on Thanksgiving and suggested that the money be wired directly to Zayre's bank. Zayre's representative repeated his comments that the payments should be made on Wednesday and not Thursday. PPA's vice president replied that Wednesday was difficult because PPA had uncollected funds that could not be in hand in time for PPA to make a payment on Wednesday. The funds were then wired to Zayre's bank.

9. In light of the payments by PPA on Thursday rather than Wednesday, Zayre sent a letter dated November 21, 1984 to PPA, with a copy to PPA's attorney, Leon Greenberg, Esq., which read as follows:

Please be advised that pursuant to Section 2 of the Stipulation and Order governing the terms of our relationship, Photo Promotion Associates, Inc. is to remit its weekly payments of $25,384.62 by certified check on each and every Wednesday.

All of these payments so far have been made by bank money order and most of them have arrived on Thursday. We hereby request that you abide by the terms of the Stipulation and Order and remit to us each weekly installment by certified check on Wednesday.

10. Nevertheless, PPA continued to make its payments to Zayre on Thursday rather than Wednesday. As in the case of the second payment, that was effected in person via a commercial airline, PPA once again had its representative fly to Boston on the following Thursday where he delivered the check to a Zayre employee.

11. On Wednesday, December 19, 1984, Zayre neither received the weekly license fee that was due from PPA nor a telephone call explaining the delay. Zayre's assistant vice president in charge of licensing operations informed Zayre's management the next morning, on Thursday, December 20, 1984, that PPA once again failed to make

payment timely as required and also that no telephone call had come in from PPA, as in the past, to explain the delay. Zayre's management decided to take care of this problem of constant delays by terminating PPA's license.

12. Between 11:00 A.M. and 12:00 noon, Zayre's assistant vice president telephoned PPA and informed them that the stipulation agreement between the parties was terminated and that PPA's employees and representatives must remove their booths and leave all of the Zayre stores where they were then conducting business. The PPA representative objected, stating that he had the required license check in his possession and that he was prepared to fly to Boston to deliver it in person, as was done before. Zayre's assistant vice president refused this offer and said that a mailgram was dispatched by Zayre to PPA officially notifying PPA that the agreement was breached by PPA and therefore, terminated by Zayre.

13. The mailgram that Zayre caused to be sent to PPA, dated October 20, 1984, reads as follows:

> YOU ARE HEREBY NOTIFIED THAT BY REASON OF THE DEFAULT OF PPA IN MEETING THE OBLIGATION TO PAY $25,384.62 ON WEDNESDAY, DECEMBER 19, 1984, ITS RIGHT TO CONDUCT BUSINESS IN ZAYRE STORES IS HEREBY TERMINATED PURSUANT TO THE STIPULATION AND ORDER ENTERED IN THE U.S. BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK ON OCTOBER 29, 1984.
>
> EFFECTIVE 12–21–84, NO FURTHER BUSINESS MAY BE CONDUCTED BY PPA IN ANY ZAYRE STORE. HOWEVER, IN ACCORDANCE WITH PARAGRAPH 17 OF THE ORIGINAL LICENSE AGREEMENT, PPA IS REQUIRED TO COMPLETE AND DELIVER ALL ORDERS WHICH IT HAS ALREADY RECEIVED FROM CUSTOMERS SOLICITED IN THE PAST IN ZAYRE STORES

LEVIN WEINTRAUB AND CRAMES
RICHARD L KORAL
225 BROADWAY
NEW YORK NY 10007

14. Although the pre-Christmas period between December 20 and December 25 involved some of the most substantial business days for PPA and their family portrait promotions, PPA's representatives were required to leave the Zayre stores on December 20, 1984 and could not return until after PPA sought the relief now in question, where Zayre was directed by the court to permit the PPA representatives to return to the Zayre stores to conduct their portrait operations pending a determination by the court with respect to PPA's requested relief.

15. The October 1984 stipulation agreement between the parties contains the following relevant paragraphs:

> 5. Paragraph 17 of the Agreement (Master License Agreement dated July 15, 1980) is hereby amended to state after the first full paragraph and before the second full paragraph thereof: "However, in the event that PPA fails to make timely payments of the license charges, Zayre may elect to immediately terminate PPA's right and authority to conduct business in all Zayre stores without further notice and to expel PPA, its agents, operators and employees, and remove its or their personal property therefrom."
>
> 6. PPA hereby consents to the termination of the automatic stay of 11 U.S.C. § 362(a) to the extent that such stay may enjoin Zayre from terminating any rights PPA may have to conduct its business within the Zayre stores, and by the "So Ordering" of this Stipulation by the United States Bankruptcy Court the automatic stay is to such extent terminated. Strict adherence to the terms of the Agreement and this Stipulation are [sic] of the essence and therefore PPA shall not seek a further order of the Bankruptcy Court to stay the termination of the New Term by Zayre, except where

such termination is reasonably deemed to be wrongful.

16. Although Zayre maintains that PPA breached their stipulation agreement and desires to be rid of PPA's promotional activities in the Zayre stores, Zayre, nevertheless, wants PPA to complete the work for which deposits have already been received from customers in Zayre's stores, since Zayre's reputation is at stake as to those customers. Accordingly, Zayre obtained a show cause order dated December 26, 1984, seeking an order permanently restraining PPA from taking any further money deposits from customers previously solicited in Zayre's stores and directing PPA to complete all orders taken from such customers.

17. When the parties met in this court to negotiate the October 29, 1984 written stipulation, Zayre insisted that the fixed license fees be paid by PPA on the Monday following the week in which they accrued. PPA objected to payment on the following Monday of each contract week because it could not collect and deposit the funds from the previous week in time to make a payment on Monday. The parties then compromised the issue by requiring the payments to be made on the following Wednesday of each week. Evidently, Wednesday is equally difficult for PPA, as evidenced by its continued payments on Thursday, notwithstanding that the parties expressly agreed in paragraph 6 of the October 29, 1984 stipulation: "Strict adherence to the terms of the Agreement and this Stipulation are [sic] of the essence...."

## DISCUSSION

Zayre was entitled to rely upon the terms of the written stipulation dated October 29, 1984, whereby PPA agreed to pay to Zayre the fixed license fee on the following Wednesday of each week, especially since the stipulation expressly provided that strict adherence to its terms was of the essence. Therefore, Zayre may not be faulted for instructing its representatives of its various stores on Thursday, December 20, 1984, to tell the PPA people to close down their operations and to leave the stores. Manifestly, this was precisely the type of response that PPA should have anticipated when it failed to notify Zayre on Wednesday, December 19, 1984, that payment would be made on Thursday instead of Wednesday. Indeed, during the previous weeks PPA's officer consistently telephoned Zayre's representative to advise that the payment would be made on Thursday, either by express mail, by personal delivery via a commercial airline or by wiring the money to Zayre's bank. PPA's silence until after Zayre's representative telephoned to advise PPA that the agreement was terminated merely confirmed that PPA was not even prepared to make a payment on Wednesday.

Nevertheless PPA argues that the money was in hand on Thursday, December 20, 1984 and that airplane tickets had been purchased so as to enable a personal delivery of the check on Thursday as had occurred in the past. Although Zayre did not approve of the belated payments on Thursday, it did accept six such payments without attempting to terminate the contract on the ground that PPA failed to comply strictly with the Wednesday payment requirement. It would, indeed, be a harsh result if the debtor's license were now terminated because it could make its payments no earlier than the Thursday following each contract week, rather than on Wednesday, as required under the contract. Evidently the parties arrived at a compromise payment date which was one day earlier than PPA could realistically meet.

In these circumstances, bankruptcy courts as courts of equity, should look with disfavor on contract forfeitures, especially if a forefeiture would imperil a debtor's reorganization efforts. *In re Allan A Resort, Inc.*, 38 B.R. 663 (Bkrtcy.D.N.H.1984); *Holtsinger, Inc. v. Cordaro (In re Cordaro)* 20 B.R. 814 (Bkrtcy.M.D.Fla.1982). There is a tendency to overlook a failure to comply strictly with the terms of a contract when the parties by their conduct, have tolerated deviations in performance. *Taylor v. Goelet*, 208 N.Y. 253, 258, 101 N.E.

867, 868 (1913); *accord Oleg Cassini, Inc. v. Couture Coordinates, Inc.*, 297 F.Supp. 821, 831 (S.D.N.Y.1969). PPA would have great difficulty in absorbing Zayre's attempted termination of the license agreement because Zayre is one of PPA's largest accounts. Such a termination might even jeopardize PPA's economic existence. To be sure, even Zayre does not desire to see PPA collapse because Zayre has crossmoved for an order directing PPA to complete all the orders which PPA previously accepted from customers in Zayre's stores. It is in the interests of both parties for PPA to stay in business and to reduce its backlog of accepted orders while continuing to make license payments each week in accordance with the October 29, 1984 agreement.

 In light of the foregoing, the October 29, 1984 agreement should not be treated as breached by a one day delay in PPA's payments to Zayre. PPA has shown by its conduct that it is able to make the required license payment on the Thursday following each license week. Therefore, PPA should be given one day in which to cure its failure to comply with the contractual requirement to make the franchise payments on Wednesday. In the event that such payments are not received by the close of business on Thursday of each contract week, Zayre would be justified in regarding such failure as an abuse of the spirit of liberality displayed in favor of permitting PPA to attempt to continue with its reorganizational efforts. Hence, any such failure by PPA to make a license payment by the close of business on the Thursday following a contract week may be considered by Zayre as an automatic breach of the October 29, 1984 agreement, and Zayre may terminate the contract by giving prompt notice of termination to PPA.

## CONCLUSIONS OF LAW

1. PPA's failure to make payment to Zayre on December 29, 1984 did not constitute a material breach of the October 29, 1984 agreement, although Zayre was justified, in the circumstances, in believing that the contract was breached and directing PPA's people to leave the Zayre stores.

2. PPA shall continue to make its license payments to Zayre as required under the October 29, 1984 agreement, but PPA shall have one day thereafter to cure any failure to pay on Wednesday, as required.

3. In the event that PPA fails to pay Zayre the required weekly license fee by the close of business on Thursday following the previous contract week, Zayre may promptly notify PPA of the termination of the contract in question.

SUBMIT ORDER on notice.