MESKILL, Circuit Judge.
Appeal from a final judgment of the United States District Court for the Southern District of New York, Duffy, J., affirming an order of the bankruptcy court. See In re Lavigne, 199 B.R. 88 (S.D.N.Y.1996). The United States Bankruptcy Court for the Southern District of New York, Lifland, C.B.J., held that Medical Malpractice Insurance Association (MMIA) must allow the Chapter 7 Trustee to purchase extended medical malpractice insurance coverage (tail coverage) for the estate of the bankrupt, Jeffrey E. Lavigne. See In re Lavigne, 183 B.R. 65 (Bkrtcy.S.D.N.Y.1995). MMIA brought an adversary proceeding in the United States Bankruptcy Court seeking a declaratory judgment that the option to purchase tail coverage expired both contractually and statutorily before the Chapter 7 Trustee attempted to exercise the option on behalf of the estate. The policy was can-celled by the debtor-in-possession before his bankruptcy case was converted from Chapter 11 to Chapter 7 of the United States Bankruptcy Code (Bankruptcy Code). The Trustee filed a cross-motion seeking to establish his right to purchase the extended coverage under the terms of the policy. In its decision on cross-motions for summary judgment, the United States Bankruptcy Court denied MMIA’s motion and granted the Trustee’s cross-motion.
The bankruptcy court held that the Chapter 11 debtor-in-possession’s cancellation of the policy was use of estate property beyond the ordinary course of business, which required notice and a hearing under 11 U.S.C. § 363(b)(1). In re Lavigne, 183 B.R. at 70-71. Since the debtor-in-possession did not provide notice, the bankruptcy court determined that the cancellation was ineffective and the policy remained in effect when the ease was converted from Chapter 11 to Chapter 7. Id. at 71. The bankruptcy court further held that because the Trustee did not assume the policy within sixty days of conversion to Chapter 7, the policy was deemed rejected under 11 U.S.C. § 365(d). Id. at 72-73. The court then held that the deemed rejection cancelled the existing coverage under the policy and triggered the policy’s sixty day automatic extended reporting period and option to purchase additional tail coverage. Id. The court concluded that the Trustee had timely exercised the option to purchase the tail coverage. Id. at 73. MMIA was directed to notify the Trustee of the premium amount due for the tail coverage and to accept the Trustee’s tender of premium payment. Id.
MMIA filed an appeal of the bankruptcy court’s decision in the district court, and the judgment was stayed pending the appeal. The district court affirmed the judgment of the bankruptcy court. In re Lavigne, 199 B.R. 88. MMIA appeals the judgment of the district court, and for the following reasons, we affirm.
BACKGROUND
MMIA, a non-profit, unincorporated underwriting association, was established by the New York Legislature in 1975 to provide *382 professional liability insurance to all medical practitioners licensed in New York. MMIA was created to cure “the lack of adequate medical malpractice insurance at reasonable rates, and ... to assure the prompt and fair disposition of medical malpractice claims.” Bleiler v. Bodnar, 65 N.Y.2d 65, 68, 489 N.Y.S.2d 885, 887, 479 N.E.2d 230, 232 (1985) (internal quotation omitted). MMIA’s rates and policy provisions are governed by New York Insurance Law. See N.Y.Ins.Law § 5501, et seq. (McKinney 1985 & Supp. 1997).
Dr. Jeffrey Lavigne, d/b/a Laser Medical Associates of New York, was a proctologist specializing in laser surgery. He had several offices throughout the New York metropolitan area and advertised extensively as “MDTusch.”
I. Lavigne’s Purchase and Cancellation of the Policy
In April 1992, Lavigne obtained a one-year claims-made professional liability insurance policy from MMIA. The policy, which became effective on April 1, 1992, covered liability for malpractice claims arising on or after the effective date, as long as the claims were first asserted during the policy period or during any extended reporting period.[1] See N.Y.Comp.Codes R. & Regs. tit. 11 § 73.1(a) (1993) (NYCRR) (defining claims-made policy).
The policy provided for an automatic sixty day tail coverage period upon termination of the policy and a concurrent sixty day option to purchase additional tail coverage. Tail coverage is insurance coverage that becomes effective upon the cancellation or termination of a policy. The coverage applies to all claims that arise during the primary policy period but are not asserted until after the stated policy period expires. Claims made during the tail period are considered to have been made during the primary policy term. See id. § 73.1(d). Under New York law, MMIA is required to provide both automatic tail coverage for sixty days and the option to purchase additional tail coverage upon the termination of a policy. Id. §§ 73.3, 73.5.
On October 8, 1992, Lavigne filed a voluntary petition for protection under Chapter 11 of the Bankruptcy Code. Lavigne continued to practice medicine and to manage his affairs as a debtor-in-possession. In this capacity, Lavigne renewed his policy with MMIA for a one year period beginning April I,1993. However, in a letter to MMIA dated September 24, 1993, Lavigne cancelled the policy and requested information regarding tail coverage. During this time, Lavigne’s personal and professional lives were in turmoil. His medical license was subject to revocation hearings and he faced over seventy medical malpractice claims. Several days before cancelling the policy, Lavigne decided to close his last remaining office. Also, following a criminal investigation, he pleaded guilty to a criminal information for tax evasion.
Two days after cancelling the insurance policy, Lavigne attempted suicide. He was hospitalized, put on suicide watch and eventually transferred to a rehabilitative facility in New Hampshire, where he remained until the end of November 1993. During the period of Lavigne’s incapacity, his attorney took over operation and control of his business affairs. Without leave of court, the attorney collected accounts receivable, placed them in a non-segregated general account and at his discretion paid certain claims. When these activities were discovered, the bankruptcy court reprimanded the attorney and ordered him to provide an accounting.
In response to the insurance cancellation letter, MMIA sent a letter to Lavigne stating that the cancellation was effective as of September 28, 1993 and that the option to purchase tail coverage would expire sixty days from termination (November 28, 1993). The stated option period expired while Lavigne was institutionalized and his attorney never purchased the tail coverage.
II. Conversion of the Bankruptcy Case to Chapter 7
On January 27, 1994, Lavigne’s case was converted from Chapter 11 to Chapter 7 and *383 Hal M. Hirseh was appointed Trustee. According to the Trustee, the circumstances of Lavigne’s incapacitation and the conduct of Lavigne’s attorney, coupled with their failure to inform the Trustee of the existence of the policy, made it impossible immediately to obtain a clear picture of the estate’s affairs. The Trustee claims that based on the above, he was unaware of the MMIA policy and unable to assume it or seek to extend the time to do so.
When the Trustee discovered the existence of the policy, he wrote a letter to MMIA dated May 3, 1994 seeking to purchase tail coverage. The Trustee claimed that Lavigne’s cancellation of the policy without court approval was invalid and that the policy remained in effect until it terminated on April 1, 1994 by its own terms. Thus, according to the Trustee, the option to purchase tail coverage did not expire until May 31, 1994. The parties entered into a Standstill and Tolling Agreement on May 27, 1994 to allow the parties to assess whether any claims would be made against Lavigne subsequent to the alleged cancellation date of September 28, 1993. At least four malpractice claims were asserted after that date. On September 29, 1994, MMIA terminated the agreement and advised the Trustee that it would not grant the request to purchase the coverage. According to MMIA, Lavigne’s cancellation was valid and therefore the option had already expired, or alternatively, the option was not available because the policy had been rejected by the Trustee.
III. Procedural History
Pursuant to Bankruptcy Rule 7001, MMIA brought an adversary proceeding seeking a declaratory judgment that its obligation to extend the option to purchase tail coverage had expired. Both parties filed motions for summary judgment, agreeing that there were no material issues of fact and the dispute could be decided as a matter of law.
MMIA argued that under section 363(c)(1) of the Bankruptcy Code, Lavigne properly cancelled the policy effective September 28, 1993, and therefore, the option to purchase tail coverage and the time to make valid claims expired on November 27, 1993. In the alternative, MMIA argued that when the case was converted from Chapter 11 to Chapter 7, the Trustee had sixty days either to accept or reject the policy, and by neither assuming the policy nor purchasing the tail coverage by March 27, 1994 (sixty days after conversion of the case), the policy was deemed rejected under 11 U.S.C. § 365(d). According to MMIA, the Trustee cannot enforce the terms of a policy that was rejected.
The Trustee argued that based on Lavigne’s failure to give notice and obtain court approval, cancellation of the policy was null and void under section 363(b)(1) because the cancellation was a use or abandonment of estate property outside the ordinary course of business. The Trustee next claimed that because the cancellation was void, the policy expired under its terms on April 1, 1994 and the option to purchase tail coverage was open until May 31, 1994. Further, as to MMIA’s alternative argument that the Trustee had rejected the policy and that the terms of a rejected policy cannot be enforced, the Trustee admitted that the policy was rejected but argued that rejection triggered the sixty day option period which remained open until May 27,1994.
The bankruptcy court denied MMIA’s motion and granted the Trustee’s motion by holding that (1) Lavigne’s cancellation of the policy was void under section 363(b)(1) because the cancellation was beyond the ordinary course of business, which required notice and a hearing, (2) the policy became the property of the Chapter 7 estate upon conversion, (3) the Trustee rejected the policy by not assuming it within sixty days of conversion, pursuant to section 365(d), and (4) rejection cancelled the existing coverage and gave rise to the automatic tail period and option to purchase additional coverage which was timely exercised by the Trustee.
Pursuant to 28 U.S.C. § 158(a), MMIA appealed the decision in the district court. The bankruptcy court stayed its order and judgment pending appeal. On July 29, 1996, the district court entered its judgment affirming the decision of the bankruptcy court. This appeal followed.
*384 DISCUSSION
Appellate jurisdiction is proper pursuant to 28 U.S.C. § 158(d). See In re Palm Coast, Matanza Shores Ltd. Partnership, 101 F.3d 253, 256 (2d Cir.1996) (section 158(d) confers jurisdiction in the court of appeals over final district court orders). When reviewing “the orders of district courts in their capacity as appellate courts in bankruptcy cases[,] ... we review the district court’s determinations of law de novo.” Id. at 256. (quotations omitted). “Our review of the district court’s decision effectively amounts to review of the bankruptcy court’s opinion in the first instance.” In re Roth American, 975 F.2d 949, 952 (3rd Cir.1992) (internal quotations omitted).
1. Section 363 — The Ordinary Course of Business
The first step of our analysis requires us to determine whether the courts below properly held that Lavigne’s initial cancellation of the policy was invalid under 11 U.S.C. § 363(b)(1).[2] The bankruptcy court found that the cancellation was “part of an illogical and desperate course of action” culminating with the closing of Lavigne’s last office and his attempted suicide. In re Lavigne, 183 B.R. at 70. We agree that cancellation was beyond the ordinary course of business and required notice under section 363(b)(1).
Lavigne’s insurance policy with MMIA was property of the bankruptcy estate. See In re Johns-Manville Corp., 837 F.2d 89, 91-93 (2d Cir.1988). Section 363(c)(1) of the Bankruptcy Code authorizes a debtor-in-possession[3] to enter into transactions involving property of the estate within the ordinary course of business without notice or a hearing. However, where the transaction is outside the ordinary course of the debtor’s business, the debtor may not “use, sell, or lease” estate property until creditors and other interested parties are given notice of the proposed transaction and the opportunity for a hearing if they object. 11 U.S.C. § 363(b)(1). “Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate’s assets.” In re Roth American, 975 F.2d at 952 (quoting In re H & S Transp. Co., 115 B.R. 592, 599 (M.D.Tenn.1990)) (alteration in original). Because Lavigne gave no notice of the proposed cancellation to his creditors, the transaction is null and void if it was beyond the ordinary course of business.
The term “ordinary course of business” generally has been accepted “to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business.” In re Watford, 159 B.R. 597, 599 (M.D.Ga.1993), aff'd without opinion, 61 F.3d 30 (11th Cir.1995). Although never specifically articulated by this Court, two tests have emerged to determine whether a transaction is “ordinary.” These tests are (1) the “creditor’s expectation test” also known as the “vertical test,” and (2) the “industry-wide test” also called the “horizontal test.” In re Roth American, 975 F.2d at 952-53; In re Dant & Russell, 853 F.2d 700, 704-05 (9th Cir.1988); In re Coordinated Apparel, 179 B.R. 40, 43 (Bkrtcy.S.D.N.Y. 1995); In re The Leslie Fay Companies, 168 B.R. 294, 304 (Bkrtcy.S.D.N.Y.1994); In re The Drexel Burnham Lambert Group, 157 B.R. 532, 537-38 (S.D.N.Y.1993). “Under this two-part analysis, ‘[t]he touchstone of “ordinariness” is thus the interested parties’ reasonable expectations of what transactions *385 the debtor in possession is likely to enter in the course of its business.’ ” In re The Drexel Burnham Lambert Group, 157 B.R. at 537 (quoting In re James A. Phillips, 29 B.R. 391, 394 (S.D.N.Y.1983)) (alteration in original).
Under the vertical test, the court “views the disputed transaction from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to” enter into a contract with the debtor. In re Dant & Russell, 853 F.2d at 705 (internal quotations omitted); In re The Leslie Fay Companies, 168 B.R. at 304. We agree with the bankruptcy court that both a hypothetical malpractice claimant and trade creditor would not expect Lavigne “to cancel his malpractice insurance in light of the bankruptcy proceeding, the cessation of his medical practice and the outstanding claims against him.” In re Lavigne, 183 B.R. at 70. As the court correctly stated: “A single, uninsured malpractice claim could deplete all of the assets of the debtor’s practice.” Id. Lavigne’s creditors expect to be repaid from the assets of the estate. It is unlikely that anyone would extend credit to a physician in Chapter 11 proceedings who was not covered by malpractice insurance, especially a physician facing many malpractice claims. Neither would a creditor or malpractice claimant expect a doctor, who was facing over seventy malpractice claims without the ability to generate revenue from his practice, to cancel his policy without purchasing tail coverage.
The horizontal test involves “an industry-wide perspective in which the debtor’s business is compared to other like businesses. In this comparison, the test is whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business.” In re Dant & Russell, 853 F.2d at 704; In re The Leslie Fay Companies, 168 B.R. at 304. The bankruptcy court properly applied this test as well. A reasonable physician practicing high risk laser surgery, facing a multitude of claims and who has lost the ability to generate income would not have cancelled his insurance policy without opting for tail coverage.
MMIA claims that the transaction was ordinary. According to MMIA, Lavigne intended to cancel his policy and purchase tail coverage because prior to the cancellation, he decided to close his remaining practice. Lavigne never purchased the tail coverage because two days after the cancellation, he attempted suicide and was hospitalized during the entire option period. While it may be within the ordinary course of business for professionals to cancel their professional liability coverage and purchase tail coverage upon the closing of their practice, the cancellation here was clearly an extraordinary action requiring notification. The circumstances surrounding Lavigne at the time of the cancellation make such an act extraordinary. “[S]ome transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary.” In re Dant & Russell, 853 F.2d at 705 (quoting In re Waterfront Companies, 56 B.R. 31, 35 (Bkrtey.D.Minn.1985)). As discussed above, an interested party would not reasonably expect a debtor seeking to reorganize his business under Chapter 11 protection, to cancel his liability insurance, potentially wiping out the assets of the bankruptcy estate. Cf. In re Anchorage Nautical Tours, 145 B.R. 637, 642 (9th Cir. BAP 1992) (surrender of major asset, which was to fund debtors’ business operations, was beyond ordinary course of business and thus creditors were entitled to notice and hearing).
In sum, we hold that cancelling the policy was an extraordinary act for which notice was required under section 363(b)(1). Because Lavigne never gave the required notice, the cancellation was void and the policy remained the property of the estate through the conversion from Chapter 11 to Chapter 7.
II. Section 365 — Rejection of the Policy
Next we decide if the courts below properly held that the Trustee’s rejection of the policy did not prevent the Trustee from purchasing tail coverage. The bankruptcy court determined that the Trustee’s failure to assume the policy within sixty days of conversion to Chapter 7 resulted in a deemed rejection of the policy under section 365(d)(1), and *386 the rejection triggered the automatic extended reporting period and sixty day option to purchase tail coverage. The bankruptcy court then concluded that the Trustee had timely exercised the option to purchase the tail coverage. For the following reasons, we agree.
Under 11 U.S.C. § 365(a), a trustee may assume or reject an executory contract of the debtor. We have stated:
The purpose behind allowing the assumption or rejection ... is to permit the trustee ... to use valuable property of the estate and to renounce title to and abandon burdensome property____ In short, ... the trustee [is allowed] to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject.
In re Orion Pictures Corp., 4 F.3d 1095, 1098 (2d Cir.1993) (citations and internal quotation omitted). Pursuant to section 365(d)(1), “if the trustee does not assume or reject an executory contract ... of the debtor within 60 days after the [case is converted to Chapter 7], ... then such contract ... is deemed rejected.” The parties agree that the Trustee did not assume or reject the policy following conversion of the case to Chapter 7 on January 27, 1994, and thus the policy was deemed rejected on March 27, 1994, sixty days after conversion.[4] Of course, in this case the Trustee did not purposely reject the policy because it was burdensome to the estate; rather, rejection was inadvertent because the Trustee claims that he was unaware of the existence of the policy in time to assume it.
A. The Extended Reporting Period
Section IV of the policy, entitled “Optional Extended Reporting Period,” provides:
In the event of the termination of this insurance by reason of non-renewal or cancellation by the Named Insured or if the Company shall cancel this policy or terminate it by refusing to renew, for reasons other than the Named Insured’s non-payment of premium ... then the Named Insured, upon payment of an additional premium ... shall have the option to extend the period during which claims may be reported to the Company____ [A] premium notice will be sent to the Named Insured or his or her legal representative. The Named Insured must inform the Company in writing of his or her intent to purchase the Optional Extended Reporting Period coverage within 60 days from the date of termination and must pay the premium therefor in full within that 60 day period or in three annual installments with an additional finance charge. Failure to so inform the Company within this 60 day period shall void the option to purchase the [optional coverage] provided in this section.
In addition, Section V, entitled “Automatic Extended Reporting Periods,” provides:
[T]he period for reporting claims or suits shall be automatically (and without the payment of any additional premium) extended for a period of 60 days if the insurance provided by this policy is terminated by either the Company or the Named Insured, for whatever reason.
The parties agree that the deemed rejection cancelled the existing coverage under the policy but dispute the effect of the rejection on the option to purchase tail coverage. MMIA claims that the rejection abrogated all rights under the policy, including the tail coverage option. The Trustee argues that rejection effected a termination of the existing coverage and triggered the sixty day option period pursuant to Section IV of the policy.
B. The Effect of Rejection
Section 365(g) addresses the effect of rejection upon a contract. If the contract has not been previously assumed, rejection of the debtor’s executory contract constitutes a breach of the contract. 11 U.S.C. § 365(g)(1); see also In re Austin Dev. Co., 19 F.3d 1077, 1082-83 (5th Cir.1994). While rejection is treated as a breach, it does not *387 completely terminate the contract.[5] Id.; In re Continental Airlines, 981 F.2d 1450, 1459-61 (5th Cir.1993); In re Modern Textile, 900 F.2d 1184, 1191-92 (8th Cir.1990); In re Tri-Glied, Ltd., 179 B.R. 1014, 1017-18 (Bkrtcy.E.D.N.Y.1995); see also 3 Collier on Bankruptcy (Lawrence P. King, et al. eds., 15th ed. 1996) (Collier) § 365.09[3] (breach is not termination of contract because, among other reasons, “[i]f rejection terminates the contract ... such termination may have consequences that affect parties other than [the parties] to the contract”); cf. In re Photo Promotion Assoc., 45 B.R. 878, 882 (S.D.N.Y.1985) (“bankruptcy courts as courts of equity, should look with disfavor on contract forfeitures”). See generally Michael T. Andrew, Executory Contracts in Bankruptcy: Understanding “Rejection,” 59 U.Colo.L.Rev. 845 (1988) (Andrew). Thus, “[Rejection merely frees the estate from the obligation to perform; it does not make the contract disappear.” In re The Drexel Burnham Lambert Group, 138 B.R. 687, 703 (Bkrtcy.S.D.N.Y.1992).
Rejection is not the power to release, revoke, repudiate, void, avoid, cancel or terminate, or even to breach, contract obligations. Rather, rejection is a bankruptcy estate’s election to decline a contract or lease asset. It is a decision not to assume, not to obligate the estate on the contract or lease as the price of obtaining the continuing benefits of the non-debtor party’s performance. That decision leaves the non-debtor in the same position as all others who have dealt with the debtor, by giving rise to a presumption that the debt- or has ‘breached’ — i.e., will not perform— its obligations. The debtor’s obligations are unaffected, and provide the basis for a claim.
Andrew, 59 U.Colo.L.Rev. at 931.
Rejection gives rise to a remedy for breach of contract in the non-debtor party. The claim is treated as a pre-petition claim, affording creditors their proper priority. Under sections 365(g) and 502(g), the date of breach is set as the date immediately prior to the debtor’s filing for bankruptcy. See also 4 Collier § 502.08[2]. The Bankruptcy Code treats rejection as a breach so that the non-debtor party will have a viable claim against the debtor. However, the Code does not determine parties’ rights regarding the contract and subsequent breach. To determine these rights, we must turn to state law. See In re Yasin, 179 B.R. 43, 50 (Bkrtcy.S.D.N.Y.1995) (because “rejection constitutes a statutory breach, but does not repudiate or terminate the [contract,] [t]he parties must ... resort to state law to determine their rights as a result of the breach”).
MMIA claims that under New York law, a non-breaching party is discharged from all contractual obligations. We find this argument to be without merit for two reasons.
First, under New York law, only “a breach in a contract which substantially defeats the purpose of that contract can be grounds for rescission. The non-breaching party will be discharged from the further performance of its obligations under the contract when the breach goes to the root of the contract.” Dept, of Economic Dev. v. Arthur Andersen & Co., 924 F.Supp. 449, 483 (S.D.N.Y.1996) (citations and quotation omitted). Put another way, a party is relieved of continued performance under a contract only when the other party’s breach is “material.” See Restatement (Second) of Contracts § 237 comment b (1979); Walter H.E. Jaeger, Williston on Contracts § 1455 (3rd ed. 1970).
The breach in this case was not material. Under the very terms of the policy, the insured has a right to terminate the insurance and purchase tail coverage. Clearly, the deemed rejection ended the primary insurance coverage under the policy. Rejection freed the estate from the burden of paying premiums under the policy by cancel-ling the existing coverage. Had the Trustee affirmatively cancelled the policy, there would be no question that the option period would be available and we see no material difference between affirmative cancellation and passive cancellation via deemed rejec *388 tion. The insured-debtor had a right to cancel the insurance and opt for tail coverage; therefore, the rejection-breach, which simplycancelled the existing coverage, did not defeat the purpose of the contract. The purpose of the malpractice policy was to insure Lavigne while practicing medicine and allow him to extend the reporting period for claims against him after the cessation of his practice.
Second, MMIA’s obligation to provide an automatic extended coverage period and option to purchase tail coverage is more than a contractual obligation — it is a statutory obligation. See 11 NYCRR §§ 73.3, 73.5. “All contracts are made subject to any law prescribing their effect, or the conditions to be observed in their performance.” In re Estate of Havemeyer, 17 N.Y.2d 216, 219, 270 N.Y.S.2d 197, 199, 217 N.E.2d 26, 27 (1966). The regulations were promulgated in large part to protect malpractice claimants.
As discussed above, MMIA “was created by the [New York] Legislature in 1975 in response to the withdrawal of many private insurance companies from the medical malpractice market in New York. MMIA was created for the express purpose of providing medical malpractice insurance, which is no longer readily available in the voluntary market.” Medical Malpractice Ins. Assoc. v. Super. of Ins. of New York, 72 N.Y.2d 753, 757, 537 N.Y.S.2d 1, 2, 533 N.E.2d 1030, 1031 (1988). MMIA is known as the insurer of “last resort.” Another principal goal of MMIA’s development was “to assure the prompt and fair disposition of medical malpractice claims.” Bleiler, 65 N.Y.2d at 68, 489 N.Y.S.2d at 887, 479 N.E.2d at 232.
New York Ins.L. § 5504(f)(1) (McKinney Supp.1997) states that MMIA shall issue claims-made policies as prescribed by the Superintendent of Insurance by regulation. The regulations promulgated by the Superintendent, which are relevant here, read in pertinent part:
[N]o claims-made liability insurance policy shall be issued or renewed ..., unless the policy and the issuing insurer comply with the following minimum standards:
(c)(1) Upon termination of coverage, extended reporting period coverage ... must be available for any claims-made liability coverage provided under the policy.
(d) Upon termination of coverage, a 60-day automatic extended reporting period ... must be provided by the insurer.
11 NYCRR § 73.3; see also 11 NYCRR § 73.5(b)(1) (“An insurer shall offer [the physician] an extended reporting period providing coverage for an unlimited time period.”). The regulations take great steps to protect physicians as well as malpractice claimants. The important policy reasons behind the regulations support our conclusion that MMIA’s statutory obligation cannot be eradicated by the deemed rejection of. the insurance policy. Holding otherwise would leave several claimants, who claim to be victims of Lavigne’s alleged malpractice during the policy period, victimized with little possibility of collecting money damages. See 3 Collier § 365.09[3] (“[i]f rejection terminates the contract ... such termination may have consequences that affect parties other than [the parties] to the contract”).
MMIA launches several other arguments that it has no obligation to extend the tail coverage purchase option. Because of the fact-specific nature of this case, we reject each argument without extended discussion. First MMIA cites several cases to support its position that an executory contract may not be rejected in part and assumed in part. See In re Chicago, Rock Island & Pacific R.R. Co., 860 F.2d 267, 272 (7th Cir.1988) (“A trustee cannot accept the benefits of an executory contract without accepting the burdens as well.”); Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir.1985) (“[T]he debtor cannot choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement.”); In re TSW Stores of Nanuet, 34 B.R. 299, 304 (Bkrtcy.S.D.N.Y.1983) (“An executory contract cannot be rejected in part, and assumed in part.... The contract must be rejected in its entirety, or not at all.”). According to MMIA, rejection relieves all of its contractual obligations, including the obligation to provide the tail cov *389 erage purchase option. We have already held that the effect of rejection was to cancel the existing coverage but not to make every aspect of the policy disappear.
MMIA also argues that in order for the estate to be vested with any benefits under the policy, the Trustee had to first assume the policy and cure any defaults.[6] Again, under the terms of the policy, the Trustee could have affirmatively cancelled the insurance at any time and exercised the tail coverage option. We cannot see that the Trustee has a lesser right after a deemed rejection than after an affirmative cancellation. Both have the effect of repudiating the existing coverage. Of course, there are procedures available to MMIA to recover the premiums owed. In sum, because the rejection does not terminate all contractual and statutory obligations, MMIA is not absolved from providing extended coverage. Rejection simply cancelled the existing coverage and triggered the policy’s sixty-day automatic extended reporting period and option to purchase additional tail coverage.
C. The Running of the Option Period
The final issue that we must decide is when the sixty day automatic extended coverage and purchase option period began to run. The lower courts held that the option period began to run on March 28, 1994, the deemed rejection date, and the Trustee’s May 3, 1994 letter was a timely exercise of the coverage option. We agree.
MMIA argues that the courts should have applied the “relation-back” provisions of section 365(g). According to MMIA, under section 365(g), the date of termination of a breached executory contract relates back to the date immediately preceding petition. Therefore, as MMIA claims, the date of termination should be set at either October 7, 1992, the day immediately before Lavigne entered Chapter 11, or January 26, 1994, the date immediately before conversion to Chapter 7. Under either of MMIA’s proposed termination dates, the May 3, 1994 letter would be untimely.
We agree with the district court that “MMIA’s proposed Section 365(g) construction would eliminate the Tail Coverage option solely as a function of the operation of the bankruptcy laws.” In re Lavigne, 199 B.R. at 91. Under MMIA’s argument, the option would either expire on December 7, 1992, nearly sixteen months before the deemed rejection and more than one year before the Trustee was even appointed, or March 26, 1994, two days before the deemed rejection date. Under that analysis, the Trustee would never have the option to purchase tail coverage after the deemed rejection date.
Section 365(g) provides the means for determining the priority of the non-debtor’s claim. When a contract is rejected, the breach claim is treated as a prepetition unsecured claim. “The purpose of section 365(g) is to make clear that, under the doctrine of relation back, the other party to a contract that has not been assumed is simply a general unsecured creditor.” 3 Collier § 365.09[1]. The section does not set the date on which a contract should be deemed terminated.
For the purpose of determining the proper termination date, the deemed rejection date should be used because it was the rejection that ended the coverage under the primary policy. Therefore, we agree with the lower eourts that the Trustee had until May 27, 1994, sixty days after rejection, to exercise the tail coverage option. The Trustee’s letter dated May 3, 1994 was a timely exercise of the option.
CONCLUSION
We hold that Lavigne’s cancellation of the policy was beyond the ordinary course of his business and invalid without notice. We also hold that the Trustee’s deemed rejection of the policy triggered the tail coverage purchase option, which was timely exercised. Based on the foregoing, we affirm the judgment of the district court.

. The policy limits were $1 million per claim and $3 million in the aggregate. The policy called for premium payments to be made in four quarterly installments.

. Court approval is not required under section 363(b)(1) as long as notice of the proposed transaction is given to third parties that have interests in the subject property. If there is no objection to the proposed transaction, the transaction may go ahead without court approval. See 3 Collier On Bankruptcy § 363.02[1] (Lawrence P. King et al. eds., 15th ed. 1996).

. 11 U.S.C. § 363(c)(1) reads in pertinent part: "unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.” This statute applies to Chapter 11 debtors-in-possession because pursuant to 11 U.S.C. § 1107(a), a debtor-in-possession in a Chapter 11 case has the rights, powers and duties of a trustee.

. The sixty days runs from the date of conversion. See 3 Collier § 365.04[l][a] (citing In re Tompkins, 95 B.R. 722 (9th Cir. BAP 1989)).

. There are situations under the Bankruptcy Code when a rejection may constitute a termination of an executory contract or lease. See, e.g., 11 U.S.C. § 365(h), (i). None of these situations is applicable in this case and we need not discuss them.

. As of September 28, 1993, Lavigne owed MMIA $4,986.17 in earned premiums.