**In re NORTHWEST AIRLINES CORPORATION, Debtor,**

**Northwest Airlines Corporation, and all other plaintiffs, Plaintiff–Appellee**

v.

**Association of Flight Attendants–CWA, AFL–CIO, and all other defendants, Defendant–Appellant,**

---

Air Line Pilots Association, International ("ALPA"), Intervenor–Appellant.

Docket Nos. 06–4371–cv(L), 06–4468–cv(CON).

United States Court of Appeals, Second Circuit.

Argued: Nov. 28, 2006.

Decided: March 29, 2007.

Edward J. Gilmartin (Robert S. Clayman and Jeffrey A. Bartos, Guerrieri, Edmond, Clayman & Bartos, P.C., on the brief) Association of Flight Attendants–CWA, AFL–CIO, Washington D.C., for Defendant–Appellant.

Richard M. Seltzer (Thomas N. Ciantra and Oriana Vigliotti, on the brief), Cohen, Weiss & Simon, New York, NY, for Intervenor–Appellant.

Brian P. Leitch, Arnold & Porter, LLP, Washington, D.C. (Timothy Atkeson, Timothy MacDonald, Kent A. Yalowitz, and Brandon H. Cowart, Arnold & Porter, LLP, New York, N.Y. and Denver, Colorado; Bruce R. Zirinsky, Cadwalader, Wickersham & Taft, LLP, New York, NY, on the brief) for Plaintiff–Appellee.

Heidi A. Wendel, Assistant United States Attorney (Michael J. Garcia, United States Attorney for the Southern District of New York, Melanie Hallums and David S. Jones, Assistant United States Attorneys, on the brief), for Amicus Curiae United States of America.

John J. Gallagher (Neal D. Mollen and Margaret H. Spurlin, on the brief), Paul, Hastings, Janofsky & Walker, LLP, Washington D.C., for Amici Curiae: Air Transport Association of America, Inc., David A. Berg, on the brief. Airline Industrial Relations Conference, Robert J. DeLucia, on the brief.

William R. Wilder (Stefan P. Sutich, on the brief), Baptiste & Wilder, P.C., Washington, D.C., for Amicus Curiae International Brotherhood of Teamsters.

Jeffrey Freund, Bredhoff & Kaiser, P.L.L.C. (Jonathan Hiatt, American Federation of Labor on the brief), Washington, D.C., for Amicus Curiae American Federation of Labor and Congress of Industrial Organizations.

Lee Seham (Lucas K. Middlebrook and Stanley J. Silverstone, on the brief), Seham, Seham, Meltz & Petersen, LLP, White Plains, NY, for Amicus Curiae Aircraft Mechanics Fraternal Association.

Scott L. Hazan (Brett H. Miller and Lorenzo Marinuzzi, on the brief), Otterbourg, Steindler, Houston & Rosen, P.C., New York, NY, for Amicus Curiae Official Committee of Unsecured Creditors of Northwest Airlines Corporation.

Before: JACOBS, Chief Judge, WALKER and RAGGI Circuit Judges.

Chief Judge JACOBS concurs in a separate opinion.

JOHN M. WALKER, JR., Circuit Judge:

This dispute between the Association of Flight Attendants ("AFA") and Northwest Airlines ("Northwest") is situated in a peculiar corner of our law more evocative of an Eero Saarinen interior of creative angularity than the classical constructions of Cardozo and Holmes. Northwest, under the protection of Chapter 11 of the Bankruptcy Code and with the bankruptcy court's imprimatur, has rejected the collective-bargaining agreement that until recently governed its relationship with the AFA and imposed new terms and conditions of employment upon its flight attendants. The AFA does not wish to accede to these terms and conditions of employment and threatens a work stoppage unless Northwest agrees to terms and conditions that are more favorable to the flight attendants.

The District Court for the Southern District of New York (Victor Marrero, *Judge*) issued a preliminary injunction precluding the AFA and its members from engaging in any form of work stoppage. It held that any such work stoppage would cause irreparable harm and, at this juncture, violate the Railway Labor Act. On this basis, the district court concluded that the Norris–LaGuardia Act did not deprive it of jurisdiction to issue the injunction.

We agree, but for substantially different reasons than those advanced by the district court. We hold that Section 2 (First) of the Railway Labor Act forbids an immediate strike when a bankruptcy court approves a debtor-carrier's rejection of a collective-bargaining agreement that is subject to the Railway Labor Act and permits it to impose new terms, and the propriety of that approval is not on appeal.

## BACKGROUND

In December 2004, Northwest, one of the nation's largest air carriers, began negotiating changes to the collective-bargaining agreement ("CBA") governing its relationship with its flight attendants, who were then represented by the AFA's predecessor, the Professional Flight Attendants Association ("PFAA"). Since April 2005, these negotiations have been conducted under the auspices of the National Mediation Board ("NMB"), which is authorized by the Railway Labor Act to mediate disputes between carriers and their employees.

In September 2005, Northwest filed for protection under Chapter 11 of the Bankruptcy Code. Northwest's plan for reorganization required that its employees make significant concessions. Most of the unions that represent groups of Northwest employees have since negotiated new agreements.

Unable to reach an accommodation with its flight attendants, on November 7, 2005, Northwest sought bankruptcy court approval of certain interim modifications to the relevant CBA under 11 U.S.C. § 1113. On November 16, the bankruptcy court granted Northwest the requested relief. Nevertheless, the parties continued to negotiate in the hope of reaching a new mutually satisfactory agreement. On March 1, 2006, the PFAA leadership tentatively agreed to a new CBA (the "March 1 Agreement"); the membership, however, rejected the agreement by a margin of four-to-one.

In addition to seeking interim relief from its CBA, Northwest sought in September 2005 to obtain permanent relief from its CBA pursuant to 11 U.S.C.

§ 1113. After the flight attendants rejected the March 1 Agreement, Northwest reiterated this request, and, this time, the bankruptcy court granted Northwest's motion to reject its CBA. The bankruptcy court explained:

> [t]he Court would do the flight attendants and the Debtors' thousands of other employees no favor if it refused to grant the Debtors' § 1113 relief, and the Debtors joined the ranks of the many other airlines that have liquidated as a consequence of a Chapter 11 filing.

*In re Nw. Airlines Corp.*, 346 B.R. 307, 330 (Bankr.S.D.N.Y.2006). Along with this relief, the bankruptcy court permitted Northwest to impose the terms of the March 1 Agreement upon the flight attendants. Neither party appealed this decision.

The bankruptcy court conditioned its decision on Northwest's agreement to negotiate for an additional two weeks before it would allow the March 1 Agreement to take effect. Negotiations ensued, this time with the Association of Flight Attendants ("AFA"), which the flight attendants had elected as their new representative on July 7, 2006. On July 17, Northwest and the AFA reached another tentative agreement; again, however, on July 31, the flight attendants rejected the proposed agreement, this time by the narrower margin of 55–45%.

Northwest then imposed the March 1 Agreement. The AFA responded by notifying Northwest of its intent to disrupt Northwest's service by using a tactic suitably named CHAOS ("Create Havoc Around Our System"), which entails mass walkouts for limited periods of time and pinpoint walkouts at certain airports or gates. *See Ass'n of Flight Attendants v. Alaska Airlines*, 847 F.Supp. 832, 833–34 (W.D.Wash.1993).

Northwest moved to enjoin the strike. Bankruptcy Judge Gropper denied the motion on the basis that Northwest's rejection of the CBA and imposition of the March 1 Agreement amounted to a "unilateral action in changing the status quo that in turn frees the employees to take job action." *Nw. Airlines Corp. v. Ass'n of Flight Attendants–CWA (In re Nw. Airlines Corp.)*, 346 B.R. at 344. On appeal, the district court reversed and granted the preliminary injunction. Judge Marrero held that Northwest had not unilaterally changed the status quo and that the union remained bound by the status quo provisions of the RLA, which forbid the exercise of self-help pending the exhaustion of various mechanisms to resolve disputes, including NMB mediation. *Nw. Airlines Corp. v. Ass'n of Flight Attendants–CWA (In re Nw. Airlines Corp.)*, 349 B.R. 338, 379 (S.D.N.Y.2006) ("[T]his Court finds that an order authorizing rejection of a collective bargaining agreement pursuant to § 1113 does not terminate the Section 6 [of the RLA] process....").

The AFA and intervenor Air Line Pilots Association filed a timely appeal.

## DISCUSSION

### I. The Statutory Framework

The AFA appeals entry of a preliminary injunction. We review the district court's judgment for abuse of discretion, although our review of its application of the law is de novo. *See Green Party v. New York State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir.2004). We inquire whether Northwest has shown,

> first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in [its] favor.

*Id.*

This appeal turns on Northwest's likelihood of success on the merits, any assess-

ment of which, in turn, requires us to interpret and heed three different statutory schemes: Section 1113 of Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1113; the Railway Labor Act of 1926 ("RLA"), 45 U.S.C. § 151 *et seq.;* and the Norris La-Guardia Act of 1932 ("NLGA"), 29 U.S.C. § 101 *et seq.*

### A. The Bankruptcy Code: 11 U.S.C. § 1113

Section 1113(a) of Title 11 provides that a carrier subject to the RLA may "reject a collective bargaining agreement" if the bankruptcy court determines (among other things) that "the balance of the equities clearly favors rejection of such agreement" and that rejection is "necessary to permit the reorganization." 11 U.S.C. §§ 1113(a), (b)(1)(A), (c)(3). However, to make such a determination, the bankruptcy court must specifically find that (1) the carrier has "ma[de] a proposal" to its employees "which provides for those necessary modifications in the employee benefits and protections that are necessary to permit the reorganization," (2) the carrier has provided its employees "with such relevant information as is necessary to evaluate the proposal," and (3) the "authorized representative of the employees has refused to accept such proposal *without good cause.*" *Id.* §§ 1113(b)(1), (c) (emphasis added). Moreover, § 1113 also explicitly precludes carriers from "terminat[ing] or alter[ing] any provisions of a collective bargaining agreement prior to compliance with the provisions" of § 1113. *Id.* § 1113(f).

Congress passed § 1113 in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). In *Bildisco,* the Court held (1) that a debtor did not violate the National Labor Relations Act ("NLRA") by "unilaterally changing the terms of the [CBA]" after

filing for bankruptcy, 465 U.S. at 519, 104 S.Ct. 1188, and (2) that the "Bankruptcy Court *should permit* rejection of a[CBA] ... that burdens the estate ... [if] after careful scrutiny, the equities balance in favor of rejecting the labor contract," *id.* at 526, 104 S.Ct. 1188. Section 1113, by precluding a debtor from unilaterally changing the terms of its CBA without court approval upon entering bankruptcy, *see supra,* overturned the Supreme Court's first holding, while leaving the second (more or less) intact. *See* Daniel Keating, *The Continuing Puzzle of Collective Bargaining Agreements in Bankruptcy,* 35 Wm. & Mary L.Rev. 503, 505–06 (1994) (noting that commentators have "question[ed] whether the new Code provision was indeed nothing more than a dressed-up version of the most central holdings in the very case that it was thought to overrule").

### B. The Norris–LaGuardia Act

The NLGA deprives federal courts of jurisdiction to issue "any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter." 29 U.S.C. § 101. While this jurisdiction-stripping provision generally admits of only limited exception, the Supreme Court has held that the NLGA does not preclude courts from enforcing the mandates of the RLA. *See Burlington N. R.R. v. Bhd. of Maint. of Way Employees,* 481 U.S. 429, 445, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987). Even so, however, a party seeking an injunction under the NLGA must have clean hands:

> No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation

or with the aid of any available governmental machinery of mediation or voluntary arbitration.

29 U.S.C. § 108.

## C. The Railway Labor Act

■ The RLA "abhors a contractual vacuum." *See Air Line Pilots Ass'n, Int'l v. UAL Corp.,* 897 F.2d 1394, 1398 (7th Cir.1990). Accordingly, a collective-bargaining agreement between a carrier subject to the RLA and its employees or their union (we use the two terms interchangeably) hardly ever expires. *See Manning v. Am. Airlines, Inc.,* 329 F.2d 32, 34 (2d Cir.1964) ("The effect of § 6 [of the RLA] is to prolong agreements subject to its provisions regardless of what they say as to termination."). Rather, once a CBA becomes "amendable," the carrier and the union are bound by statute to embark upon an "almost interminable" re-negotiation process. *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,* 396 U.S. 142, 149, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). During the pendency of this re-negotiation process, the RLA "obligate[s] [the parties] to maintain the status quo." *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n,* 491 U.S. 299, 302, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989).

■ The term "status quo," found throughout the case law, appears nowhere in the RLA. Several of the RLA's provisions require that parties to a CBA governed by the RLA maintain objective working conditions during the pendency of any dispute arising under (or during the re-negotiation of) their CBA. *See* 45 U.S.C. §§ 152 (Seventh), 155 (First), 156, 160 [1]; *see also Aircraft Mechs. Fraternal Ass'n v. Atl. Coast Airlines* ("*Atlantic Coast II* "), 125 F.3d 41, 43 (2d Cir.1997) (explaining the statutory basis for the requirement that both parties maintain the status quo).

The Supreme Court has described the function of these status quo provisions as follows: "The [RLA]'s status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or a lockout." *Shore Line,* 396 U.S. at 150, 90 S.Ct. 294. Only after the parties have fully exhausted the dispute resolution and re-negotiation processes does a CBA expire, freeing the parties from their contractual obligations and the RLA's rules governing the preservation of the status quo. *Cf. Pan Am. World Airways v. Int'l Bhd. of Teamsters, Chauffeurs & Helpers of America,* 894 F.2d 36 (2d Cir.1990).

■ While the status quo provisions are integral to the RLA, the "heart" of that statute is Section 2 (First), *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 377–78, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969), which requires carriers and employees to "exert every reasonable effort to make [agreements,] . . . [to] maintain agreements . . . and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce," 45 U.S.C. § 152 (First). The broad command of Section 2 (First) fills the interstices of the explicit status quo provisions: A carrier or its employees may invoke it either to ensure effective compliance with the explicit status quo provisions, *see Chicago & Nw. Ry. Co. v. United Transp. Union,* 402 U.S. 570, 578, 91 S.Ct.

---

**1.** These are the "explicit status quo provi- sions."

1731, 29 L.Ed.2d 187 (1971) ("The strictest compliance with the formal procedures of the Act [the RLA] is meaningless if one party goes through the motions with 'a desire not to reach an agreement.'"), or to further justify an injunction premised primarily on those provisions, *see Shore Line,* 396 U.S. at 152, 90 S.Ct. 294 (holding that the explicit status quo "provisions, together with [§ ] 2 First, form an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute through the final 30–day 'cooling-off' period"). We thus conceive of this "implicit status quo requirement" of Section 2 (First), *see id.* at 151, 90 S.Ct. 294, as supplementary to the RLA's explicit status quo provisions.

Critical to this case, however, Section 2 (First) also imposes a separate duty, which is less closely related to the RLA's status quo provisions: carriers and unions must "exert every reasonable effort to make [agreements] ... and to settle all disputes," 45 U.S.C. § 152 (First), even when the rules governing the RLA's status quo are not in effect. As the Supreme Court has explained, "[t]he statute does not undertake to compel agreement between the employer and employees, but it does command those preliminary steps without which no agreement can be reached. It at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort [sic] to compose differences—in short, to enter into a negotiation for the settlement of labor disputes...." *Virginian Ry. Co. v. Sys. Fed'n No. 40,* 300 U.S. 515, 548, 57 S.Ct. 592, 81 L.Ed. 789 (1937); *compare Int'l Ass'n of Machinists & Aerospace Workers v. Transportes Aereos Mercantiles Pan Americandos, S.A.,* 924 F.2d 1005, 1008–1009 (11th Cir.1991), *with Regional Airline Pilots Ass'n v. Wings West Airlines, Inc.,* 915 F.2d 1399, 1403 (9th Cir.1990), and *Int'l Ass'n of Machinists & Aerospace Workers v. Trans World Airlines, Inc.,* 839 F.2d 809, 814 (D.C.Cir. 1988).

■ We conclude that, in light of Northwest's court-authorized rejection of its CBA under § 1113, the Norris–LaGuardia Act does not bar the district court's preliminary injunction because the union's proposed strike would violate this separate duty under Section 2 (First) to "exert every reasonable effort to make [agreements] ... and to settle all disputes." 45 U.S.C. § 152 (First). The union concedes that it has an ongoing duty to negotiate under Section 2 (First), but, nevertheless, argues that it is "free to strike" because Northwest "unilaterally alter[ed] the contractual 'status quo.'" Appellant's Br. at 15. As we explain below, this argument fails because Section 2 (First) operates independently of the RLA's status quo provisions (and the implicit status quo requirement of Section (2) First). Moreover, the AFA fails to recognize the unique effect on the status quo of a debtor's rejection of a CBA pursuant to § 1113. Because this unique effect informs the bulk of our analysis, it is to this latter issue that we now turn.

## II. The Effect of Contract Rejection Under 11 U.S.C. § 1113

■ To understand the legal consequences of Northwest's rejection, we turn first to the plain text of § 1113, *see Leocal v. Ashcroft,* 543 U.S. 1, 8, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004); *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 252, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992), and then to that of the RLA, reading these two statutory schemes *seriatim,* from the most recent to the oldest, *see, e.g., Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.),* 922 F.2d 984, 991 (2d Cir.

1990) ("[W]e must give effect to the most recently enacted statute since it is the most recent indication of congressional intent."), and from the more specific to the more general, *see, e.g., Morton v. Mancari,* 417 U.S. 535, 550–51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). We also assume that Congress passed each subsequent law with full knowledge of the existing legal landscape, *Miles v. Apex Marine Corp.,* 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) ("We assume that Congress is aware of existing law when it passes legislation."), and without intending the absurd, *see Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 509–10, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989).[2]

With these principles in mind, we reach three conclusions: (1) Northwest's rejection of its CBA after obtaining court authorization to do so under 11 U.S.C. § 1113 abrogated (without breaching) the existing collective-bargaining agreement between the AFA and Northwest, which

---

**2.** The district court—and Chief Judge Jacobs in his concurrence—strive to "harmonize" the Bankruptcy Code and the RLA. *See In re Nw. Airlines Corp.,* 349 B.R. at 373–83; *id.* at 345 (discussing the duty to "view the terms, policies, purposes and structures of the applicable laws as a whole and to read any clashing provisions in a manner that endeavors to accommodate them as much as possible"); *post* at 183–84 (arguing that "[l]abor agreements in the RLA framework" should be treated differently than other agreements by bankruptcy courts because they are "multilateral insofar as they account for the public interest"). Their effort on this score is not only unnecessary—because the statutory schemes are not in conflict, *cf. United States v. Oakland Cannabis Buyers' Coop.,* 532 U.S. 483, 494, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001) ("[T]he canon of constitutional avoidance has no application in the absence of statutory ambiguity."); *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154–55, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976)—but also risks upsetting long-settled rules of bankruptcy law, *cf. California v. FERC,* 495 U.S. 490, 499, 110 S.Ct. 2024, 109 L.Ed.2d 474 (1990) (noting that courts "must accord [deference] to longstanding and well-entrenched decisions, especially those interpreting statutes that underlie complex regulatory regimes"); *Patterson v. McLean Credit Union,* 491 U.S. 164, 172–173, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (same). Indeed, as we explain *infra,* the district court's holding that Northwest and the AFA remain bound to preserve the RLA's status quo, adopted on appeal by Chief Judge Jacobs, is at odds with numerous decisions suggesting that the status quo ceases when an employer rejects a CBA with the approval of a bankruptcy court. *See Truck Drivers Local 807 v. Carey Transp. Inc.,* 816 F.2d 82, 93 (2d Cir.1987) (urging the bankruptcy court to consider "the possibility and likely effect of any employee claims for breach of contract if rejection is approved"); *Truck Drivers Local Union No. 807 v. Bohack Corp.,* 541 F.2d 312, 317–318 (2d Cir.1976); *Bhd. of Ry., Airline & Steamship Clerks, Freight Handlers, Express & Station Employees v. REA Express, Inc.,* 523 F.2d 164, 170 (2d Cir.1975); *In re Maxwell Newspapers, Inc.,* 146 B.R. 920, 922 (Bankr.S.D.N.Y.1992), *aff'd in part, rev'd in part,* 981 F.2d 85 (2d Cir.1992); *In re Royal Composing Room, Inc.,* 62 B.R. 403, 405 (Bankr.S.D.N.Y.1986), *aff'd,* 848 F.2d 345 (2d Cir.1988); *Comair, Inc. v. Air Line Pilots Ass'n, Int'l (In re Delta Air Lines, Inc.),* 359 B.R. 491, 505–06, 2007 WL 414520, at *12 (Bankr.S.D.N.Y.2007); *see also Air Line Pilots Ass'n, Int'l v. Cont'l Airlines, Inc. (In re Cont'l Airlines Corp.),* 901 F.2d 1259, 1261 (5th Cir.1990); *Briggs Transp. Co. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.,* 739 F.2d 341, 343 (8th Cir.1984) (While bankruptcy law "may have authorized Briggs to cut its employees' wages . . ., it does not prohibit the employees from complaining.") (internal quotation marks omitted) (alteration in original); *In re Garofalo's Finer Foods, Inc.,* 117 B.R. 363, 374 (Bankr.N.D.Ill.1990) ("[U]pon rejection, if the parties have not come to terms, the union employees' right to strike and other rights under applicable law can be fully exercised if they so choose."); *In re Tex. Sheet Metals, Inc.,* 90 B.R. 260, 273 (Bankr.S.D.Tex. 1988). *But see Mesaba Aviation, Inc. v. Aircraft Mechs. Fraternal Ass'n (In re Mesaba Aviation, Inc.),* 350 B.R. 112, 130 (Bankr. D.Minn.2006); *In re Blue Diamond Coal Co.,* 147 B.R. 720, 729–30 (Bankr.E.D.Tenn.1992); *In re Armstrong Store Fixtures Corp.,* 139 B.R. 347, 350 (Bankr.W.D.Pa.1992).

thereafter ceased to exist; (2) Northwest's abrogation of the CBA necessarily terminated the status quo created by that agreement, after which termination both the RLA's explicit status quo provisions and the implicit status quo requirement of Section 2 (First) ceased to apply; but (3) the AFA's proposed strike would, at present, violate the union's independent duty under the RLA to "exert every reasonable effort to make ... [an] agreement," 45 U.S.C. § 152 (First), and thus may be enjoined. We proceed to discuss these conclusions in some detail.

### A. Rejection of the CBA pursuant to the bankruptcy court's § 1113 order abrogates that agreement.

■ In theory, Northwest's rejection of its CBA under § 1113 could lead to one of three possible legal consequences: (1) Northwest abrogated the CBA in its entirety and replaced it with the March 1 Agreement; (2) Northwest replaced certain terms of the CBA with the more

favorable terms of the March 1 Agreement, but the CBA otherwise continued in force and Northwest did not breach it; or (3) Northwest replaced certain terms of the CBA with the more favorable terms of the March 1 Agreement, but the CBA otherwise continued in force and Northwest did breach it.[3] The first interpretation of the effect of Northwest's rejection of the CBA is far and away the most plausible.

■ The latter two interpretations suffer from one common defect: they ignore the unique purpose of § 1113. Section 365 of Title 11, like § 1113, authorizes contract rejection in bankruptcy.[4] And, to be sure, under § 365, if a debtor rejects an executory contract, "it does not completely terminate the contract." *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 386–87 (2d Cir.1997). But Northwest did not reject the CBA at issue pursuant to § 365. It acted with the au-

---

**3.** Chief Judge Jacobs suggests that we need not decide this question; rather, he contends that "[t]he question is whether the [imposition of the March 1 Agreement] violated Northwest's duty to maintain the status quo." *Post* at 178, 183. However, we must look to bankruptcy law to determine the *effect* of contract rejection before assessing the *rights* and *remedies* of each party subsequent to that rejection. *See, e.g., Carey*, 816 F.2d at 93; *Bohack*, 541 F.2d at 317–18. Indeed, as we explained in *In re Lavigne*, "[t]he Bankruptcy Code [generally] treats rejection as a breach so that the non-debtor party will have a viable claim against the debtor." 114 F.3d at 387 (emphasis added). For reasons explained herein, we conclude that § 1113 is an exception to this general principle; a debtor who rejects a contract pursuant to that statutory authority abrogates rather than breaches the CBA at issue.

Chief Judge Jacobs also suggests that we "miss[ ] the point," because a collective-bargaining agreement is not a "private bilateral contract" and therefore "not susceptible to ... analysis" under bankruptcy law. *See post*

at 183. It is he who misses the point. He cannot, simply by invoking "multilateralism," exorcize bankruptcy law from this case; indeed, both *Carey* and *Bohack* involved purveyors of services in which the public had an interest, and we gave no hint that they were outside the normal bankruptcy rules because the contracts in those cases were "multilateral." *Compare post* at 183–84 (noting that the CBA in this case is "multilateral") *with Carey*, 816 F.2d at 85 (noting that the debtor "has been engaged in the business of providing commuter bus service between New York City and Kennedy and LaGuardia Airports"), and *Truck Drivers Local 807 v. Bohack Corp.*, No. 75–C–905, 1975 WL 1213, at *1 (E.D.N.Y. 1975), *rev'd by Bohack*, 541 F.2d 312 (noting that "Bohack operates a chain of retail supermarkets throughout Brooklyn, Queens, Nassau, and Suffolk Counties").

**4.** Section 365 of Title 11 provides that, subject to certain exceptions, "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

thority of a court order entered pursuant to § 1113. Contract rejection under § 1113, unlike contract rejection under § 365, permits more than non-performance; it allows one party, with the court's approval, to establish *new terms* that were not mutually agreed upon, the antithesis of a status quo.[5] A carrier's obligation to comply with those new terms cannot be reconciled with the continued existence of its prior contract. *Compare In re Lavigne*, 114 F.3d at 389 (holding under § 365 that "because the rejection does not terminate all contractual and statutory obligations, [the parties are] not absolved from [compliance with the contract]"), *with Comair, Inc. v. Air Line Pilots' Ass'n, Int'l (In re Delta Air Lines, Inc.)*, 359 B.R. 491, 505 (Bankr.S.D.N.Y.2007) ("Section 1113 is forward-looking ... [and] it necessarily terminates the debtor's obligation to comply with the [prior] agreement"). If a rejected CBA were somehow to remain in force (to whatever extent), a carrier's adherence to a new, bankruptcy-court-approved contract would surely violate Section 2 (Seventh) of the RLA, which prohibits carriers from "chang[ing] the rates of pay, rules, or working conditions of its employees, as a class *as embodied in agreements* except in the manner prescribed in such agreements or in section 156 of this title." 45 U.S.C. § 152 (Seventh) (emphasis added); *see also Shore Line*, 396 U.S. at 153, 90 S.Ct. 294 (requiring a carrier to maintain "actual, objective working conditions").

Likewise, these two interpretations (CBA still in force—no breach; CBA still

in force—breach) are also difficult to square with the structure of § 1113. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) ("[W]e must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law.") (alteration in original) (internal quotation marks omitted). Sub-section (f) of § 1113 provides that a carrier may not "unilaterally terminate or alter any provisions of a collective bargaining agreement *prior to compliance with the provisions*" of § 1113. 11 U.S.C. § 1113(f) (emphasis added). If sub-section (f) forbids unilateral alteration of a CBA unless and until a carrier properly invokes sub-section (a), were we required to definitely interpret sub-section (a), we might well agree with appellants that it *permits* a carrier "unilaterally" to alter its employees' terms and conditions of employment. But such a "unilateral change" would no doubt breach the RLA's status quo provisions (both explicit and implicit), *see Consol. Rail Corp.*, 491 U.S. at 306, 109 S.Ct. 2477; *post* at 178–79. And this would lead to an odd result indeed: an airline's exercise of its options under § 1113, a statute that was passed after the RLA and specifically contemplated use by air carriers, *see* 11 U.S.C. § 1113(a) (extending coverage to air carriers but not railroads), would constitute a *violation* of the RLA.

The second possible interpretation of the effect of contract rejection under § 1113 (CBA still in force—no breach) is also at odds with bankruptcy precedent (of which

---

**5.** Neither party appealed the bankruptcy court's implicit holding that it had the authority under § 1113 to impose new terms upon both carrier and union, *see In re Nw. Airlines Corp.*, 346 B.R. at 331 ("The rejected proposal is the key proposal for purposes of § 1113, and this is the proposal that presumably should be put in effect if the union has rejected it without good cause."), and we therefore

assume without deciding that a bankruptcy court has such authority. We note simply that the text of § 1113 is not explicit on this score, *cf.* 11 U.S.C. § 1113(e) (explicitly permitting the bankruptcy court to impose "interim changes"), and that the bankruptcy court must look elsewhere in the Bankruptcy Code to find such authority, *cf. In re Garofalo's Finer Foods, Inc.*, 117 B.R. at 370.

Congress was presumably aware when it passed § 1113), holding that under § 365, a party who rejects an executory contract also breaches it. As the Fifth Circuit explained in *In re Continental Airlines*, "it is difficult to reconcile a holding that damages are due when a[CBA] is rejected [with] an argument that that agreement at the same time does not effectively exist." *O'Neill v. Cont'l Airlines, Inc. (In re Cont'l Airlines)*, 981 F.2d 1450, 1460 (5th Cir.1993). The converse is equally true; it is difficult to understand how a carrier can partially assume a CBA but not have its partial rejection of the CBA effect a simultaneous breach of the agreement.

The third possible interpretation of the effect of contract rejection under § 1113 (CBA still in force—breach) is equally flawed. If a carrier that rejected a CBA simultaneously breached that agreement *and* violated the RLA, the union would be correspondingly free to seek damages or strike, results inconsistent with Congress's intent in passing § 1113. *Cf. In re Delta Air Lines, Inc.*, 359 B.R. at 509; *In re Blue Diamond Coal Co.*, 147 B.R. 720, 732 (Bankr.E.D.Tenn.1992), *aff'd*, 160 B.R. 574 (E.D.Tenn.1993). Moreover, even if a carrier breached that agreement but *did not* violate the RLA, the union would probably still be free to strike. The obligations of carrier and union under the explicit status quo provisions of the RLA are equal and mutual. *Shore Line*, 396 U.S. at 155, 90 S.Ct. 294. And if a carrier may breach its CBA without violating the RLA, it is plausible that a *union* might go on strike without violating the RLA. *Cf. NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960) (strike not incompatible with duty to bargain in good faith).

Under the circumstances of this case, we adopt the first of the three possible interpretations we have identified: We hold that Northwest, acting pursuant the authority conferred to it by the bankruptcy court, *abrogated* its CBA. The purpose of § 1113—to permit CBA rejection in favor of alternate terms without fear of liability after a final negotiation before, and authorization from, a bankruptcy court—naturally leads to such a conclusion. In addition, this holding suffers from none of the defects that we have identified in the two other possible interpretations of § 1113; nor does it offend our decisions in two ostensibly analogous, but in fact quite different, classes of cases: those arising under § 365 and those governed by the NLRA.

We have intimated that a union would be free to strike following contract rejection under § 365. *See, e.g., Truck Drivers Local 807 v. Carey Transp. Inc.*, 816 F.2d 82, 93 (2d Cir.1987). However, substantial differences between § 1113 and § 365 justify a different understanding of the consequences of invoking the former. Congress passed § 1113 in response to the Supreme Court's holding that a debtor did not violate the NLRA by unilaterally changing the terms and conditions of employment detailed in a CBA after entering bankruptcy. *See United Food & Commercial Workers Union, Local 328, AFL–CIO v. Almac's Inc.*, 90 F.3d 1, 4 (1st Cir.1996) (explaining this history). Congress sought to ensure that carriers could not avoid their agreements with their employees immediately upon entering bankruptcy, *cf.* 11 U.S.C. § 1113(e) (authorizing interim changes under limited circumstances); rather, it made contract avoidance possible only after a debtor procured court permission. But under § 365, if a debtor rejects an executory contract, courts assume a breach as of "the date immediately prior to the debtor's filing for bankruptcy." *In re Lavigne*, 114 F.3d at 387. Rejection under § 365 thus leads to a legal fiction at odds with the text of (and impetus behind)

§ 1113. Consistent with Congress's purpose, we are obligated to construe the statutory scheme to distinguish the legal consequences of rejection under § 365—including our suggestion that employees aggrieved by the rejection may strike—from the legal consequences of rejection under § 1113. *Cf. In re Ionosphere Clubs,* 922 F.2d at 991–92 (applying traditional canons of statutory construction to § 1113).

In cases governed by the NLRA, we have also hinted that a union is free to strike, even following contract rejection under § 1113. *See, e.g., In re Royal Composing Room, Inc.,* 62 B.R. 403, 405 (Bankr.S.D.N.Y.1986), *aff'd* 848 F.2d 345 (2d Cir.1988); *cf. NLRB v. Burns Int'l Sec. Servs., Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). But a union's right to strike under the NLRA depends upon the terms of the CBA to which it is a party (for instance, the existence or continued viability, or lack thereof, of a contractual "no-strike clause"). *See* 29 U.S.C. § 163. If successful procurement of a § 1113 order permits an employer to *abrogate* a CBA, it follows that a union subject to the NLRA would become free to strike consistent with *In re Royal Composing Room* precisely because it would no longer be bound by any contractual no-strike clause to which it might at one point have agreed. At the same time, however, a union subject to the RLA would still be under an obligation first to "exert every reasonable effort to make [agreements] ... and to settle all disputes" pursuant to Section 2 (First), notwithstanding the nonviability of any contractual no-strike clause. *See infra.*

We thus conclude that a carrier-debtor governed by the RLA and authorized by the bankruptcy court acting pursuant to § 1113 to reject its CBA and impose new terms *abrogates* its CBA.

**B. Rejection under § 1113 terminates the status quo.**

 We must next consider how, if at all, the RLA applies in the event a carrier abrogates its CBA. The RLA's explicit status quo provisions attach to "rates of pay, rules, or working conditions ... *as embodied in agreements,*" 45 U.S.C. § 152 (Seventh) (emphasis added). *See, e.g.,* 45 U.S.C. § 156 ("Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements...."). The plain text of these provisions compels the conclusion that they do not apply after a carrier has abrogated its CBA and the "agreement" has ceased to exist. *See, e.g., Atlantic Coast II,* 125 F.3d at 43 (refusing to apply the RLA's status quo provisions to the parties' objective working conditions prior to their agreement to an initial CBA); *Atlas Air, Inc. v. Air Line Pilots Ass'n,* 232 F.3d 218, 223 (D.C.Cir.2000) ("By their express terms, the[ ] so-called 'status quo' provisions of the Act only prohibit unilateral changes in wages or working conditions where there is a preexisting collective bargaining agreement."); *In re Delta Air Lines, Inc.,* 359 B.R. at 506 ("The meaning, logic and purpose of both the contract rejection provisions in Section 1113 and the status quo provisions in the RLA compel the conclusion that a collective bargaining agreement which has been rejected can no longer constitute an 'agreement' within the meaning of RLA Section 2 Seventh and Section 6 such that the proscription in those provisions against changes in terms of employment would apply."). The RLA does not contemplate the inauguration of a new status quo absent the mutual agreement of labor and management. *Cf. Pan Am.,* 894 F.2d at 39 (rejecting the notion that "a new status quo has been created by changed circumstances and the passage of time").[6]

■ Nor does the implicit status quo requirement of Section 2 (First) apply in the absence of a collective-bargaining agreement to which both carrier and union have assented. First, like the explicit status quo provisions, Section 2 (First) refers to "agreements" between the parties, 45 U.S.C. § 152 (Second), not court-approved terms and conditions of employment opposed by one party. Second, it would be odd to construe the implicit status quo requirement of Section 2 (First) to reach farther than the explicit status quo provisions, since the Supreme Court only clarified that Section 2 (First) was judicially enforceable more than forty years after passage of the RLA. *See Chicago & N.W. Ry. Co. v. United Transp. Union,* 422 F.2d 979, 985 (7th Cir.1970) ("We construe § 2, First, as a statement of the purpose and policy of the subsequent provisions of the Act and not as a specific requirement anticipating judicial enforcement."), *rev'd,* 402 U.S. 570, 581, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971) ("[W]e think the conclusion inescapable that Congress intended the enforcement of [§ ] 2 First to be overseen by appropriate judicial means....").

### C. Rejection under § 1113 leaves intact the duty to "make" agreements under Section 2 (First).

■ The explicit duty to exert every reasonable effort to "make" agreements, however, is distinct from the implicit status quo requirement of Section 2 (First). 45 U.S.C. § 152 (First) (imposing the duty not only to "maintain" agreements but also to "make" them). The duty to "make" agreements governs the parties' conduct both after a collective-bargaining agreement has lapsed, *see Pan Am.,* 894 F.2d 36, and pending the negotiation of an initial agreement, *see Atlantic Coast II,* 125 F.3d 41. The difference between the strict requirement that carriers and their employees "maintain" agreements and the somewhat more flexible duty to "make" agreements is a natural result of the different treatment the law affords "[a]rrangements made after collective bargaining" and "those made by a carrier [or a union] for its own convenience and purpose," *Jacksonville Terminal,* 315 U.S. at 403, 62 S.Ct. 659: As the Supreme Court has explained, arrangements made after collective bargaining "are entitled to a higher degree of permanency and continuity." *Id.*

■ We thus conclude that a bankruptcy court acting pursuant to § 1113 may authorize a debtor to abrogate its CBA, effectively shielding it from a charge of breach. Such abrogation, by terminating the parties' agreed-to working conditions, also absolves them of their status quo duties under the RLA.[7] It does not,

---

**6.** Chief Judge Jacobs argues that the RLA's status quo obligations do not "perish[ ] with the underlying agreement." *See post* at 182. To buttress his argument, he invokes the Supreme Court's holding in *Shore Line* that the " 'as embodied in agreements' restriction" does not apply to sections of the RLA other than 45 U.S.C. § 152 (Seventh). *Shore Line,* 396 U.S. at 155–56, 90 S.Ct. 294; *post* at 181–82. However, *Shore Line* rested on principles of implied contract, *see id.* at 154–55, 90 S.Ct. 294 (noting that "[i]t would be virtually impossible to include all working conditions in a collective-bargaining agreement" and holding

that "[w]here a condition is satisfactorily tolerable to both sides," it is protected by the RLA's status quo). We cannot read *Shore Line* to permit one party to impose a new set of fundamental terms upon the other under the aegis of the RLA's status quo; indeed, our reading is quite the reverse.

**7.** Chief Judge Jacobs argues that our holding necessarily means that Northwest has " 'failed to comply with [an] obligation imposed by law' " and cannot, therefore, obtain an anti-strike injunction. *Post* at 183–84 (quoting 29 U.S.C. § 108). Not so. Since Northwest's

however, free the parties from their Section 2 (First) duty to "exert every reasonable effort" to make a new contract that would effect a new status quo. Indeed, the AFA conceded as much at oral argument. Accordingly, the relevant inquiry is whether the flight attendants' proposed strike would violate such a duty at this time.

### III. The Duty to "Make" Agreements Under the RLA and the AFA's Proposed Strike

■ The "reasonable effort" required by Section 2 (First) has uncertain contours. At times, this court has suggested that "injunctive relief under section 152 First may be limited to cases where parties have bargained in bad faith." *United Air Lines, Inc. v. Airline Div., Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 874 F.2d 110, 114 n. 5 (2d Cir.1989); *cf. Shore Line*, 396 U.S. at 155 n. 23, 90 S.Ct. 294. On the other hand, the Supreme Court has expressly reserved decision on whether the duty entails "more ... than avoidance of 'bad faith.'" *Chicago & Nw.*, 402 U.S. at 579 n. 11, 91 S.Ct. 1731.

The critical fact is that the Section 2 (First) duties are not fully reciprocal. This conclusion, that carriers and their employees may at times bear different, even unequal burdens, despite being subject to the same standard, is compelled by our decisions in the *Atlantic Coast* cases. In *Aircraft Mechanics Fraternal Ass'n v. Atlantic Coast Airlines, Inc.* ("*Atlantic Coast I*"), we held that a carrier did not breach Section 2 (First) by making unilateral changes to the terms and conditions of

employment so long as it did not bargain in bad faith. 55 F.3d 90 (2d Cir.1995). Yet in *Atlantic Coast II*, we held that a union *did* breach Section 2 (First) by making (even if in good faith) a unilateral change to the terms and conditions of employment—e.g., by striking—where the railroad had taken no bad faith action to provoke such a response. *See* 125 F.3d 41. In line with our precedent, we hold today that in the absence of carrier bad faith, a union must come closer to exhausting the dispute resolution processes of the RLA than the AFA has in this case in order to satisfy its duty under Section 2 (First). There is no need at this point to decide when and if the AFA will have fulfilled its duty; it has not done so yet.

In approving Northwest's motion to reject its collective-bargaining agreement, the bankruptcy court found, as it was required to do, *see* 11 U.S.C. § 1113(b)(1)(A), that Northwest's rejection of the CBA was *necessary*; Northwest remains willing to negotiate, including with regard to terms more favorable to the flight attendants than those the AFA has already accepted on their behalf; and the NMB has yet to conclude that further negotiations would be futile. The AFA's proposed strike cannot therefore be justified as a response to Northwest's violation of the RLA. *See United Air Lines*, 874 F.2d 110.

Simply put, the AFA has not exerted "every reasonable effort" to reach agreement. It has not sought to persuade its members of the need to "face[ ] up to economic reality." *In re Nw. Airlines Corp.*, 346 B.R. at 331; *cf. United Air Lines, Inc., v. Int'l Ass'n of Machinist & Aerospace Workers, AFL–CIO*, 243 F.3d

abrogation of its CBA, authorized by the bankruptcy court, *ended* the RLA's status quo, Northwest cannot have breached the RLA's status quo provisions. As we have already explained, *see supra* at 170 n. 3, the effect of

contract rejection under bankruptcy law is a question antecedent to analysis of the rights and remedies of each party subsequent to that rejection.

349 (7th Cir.2001) (holding that union had duty under Section 2 (First) to control employee behavior and prevent "wildcatting"). Nor has it sought the assistance of the NMB, which is at least available on consent of the parties.[8] Finally, since "reasonableness" under the RLA, like "reasonableness" under the NLRA, *see, e.g., Ass'n of Flight Attendants, AFL–CIO v. Horizon Air Indus., Inc.,* 976 F.2d 541, 545 (9th Cir.1992), is informed by the "reasonableness of the proposals," *id.,* our conclusion is buttressed by the AFA's failure to take account, as it must, of the duty Northwest "owes the public," *Bhd. of Ry. and Steamship Clerks, Freight Handlers, Express and Station Employees, AFL–CIO v. Florida East Coast Ry. Co.,* 384 U.S. 238, 245, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966).

The AFA argues that the foregoing reasoning is too one-sided in the carrier's favor and thus is at odds with the legislative history of the RLA, which was drafted by "a team composed of representatives of *both* management and labor." *See Summit Airlines, Inc. v. Teamsters Local Union No. 295,* 628 F.2d 787, 789 (2d Cir. 1980) (emphasis added). But the duty Section 2 (First) imposes upon carriers is not toothless. *Bhd. of Maint. of Way Employees v. Union Pac. R.R. Co.,* 358 F.3d

453, 458 (7th Cir.2004) ("[T]he duty to exert every reasonable effort requires a [carrier] to do more than discharge its legal obligations."). Indeed, were a carrier simply to go "through the motions" of negotiating, *see* Archibald Cox, *The Duty to Bargain in Good Faith,* 71 Harv. L.Rev. 1401, 1413 (1958), it would violate its duty. Moreover, the scope of the duty to bargain in good faith increases as the parties approach agreement; for instance, whether the carrier has already agreed to a tentative deal, *see Transportes Aereos,* 924 F.2d at 1008–09, and whether it has a history of negotiating with a particular union, *see Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1253 (2d Cir.1992), are relevant variables. *Cf.* Cox, *supra* (suggesting that under certain circumstances unilateral changes to the terms and conditions of employment may constitute circumstantial evidence of bad faith). Finally, carriers must meet with union representatives, *United Air Lines,* 874 F.2d at 115, and, whether or not an agreement exists, must accede to a union's request for NMB assistance, 45 U.S.C. § 155,[9] or face a strike, *cf. Bhd. of R.R. Trainmen Enter. Lodge, No. 27 v. Toledo, Peoria & W. R.R.,* 321 U.S. 50, 57–58, 64 S.Ct. 413, 88 L.Ed. 534 (1944).[10] If North-

**8.** We do not and need not decide whether the district court may enjoin the parties to return to the NMB. At least one circuit court has seen fit to do so under analogous circumstances. *See Chicago & Nw. Ry. Co. v. United Transp. Union,* 471 F.2d 366, 368–69 (7th Cir.1972) (Clark, J.). However, it is for the district court to tailor the preliminary injunction in further proceedings.

**9.** Section 5 (First) vests the NMB with jurisdiction over disputes "concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference." 45 U.S.C. § 155 (First). The text of Section 2 (Sixth), which directs the parties to hold conferences in the event of a dispute arising "out of grievances or out of the interpretation or

application of agreements," 45 U.S.C. § 152 (Sixth), suggests that the NMB has jurisdiction of a dispute even if it does not concern a written agreement.

**10.** While the Supreme Court has instructed that we be circumspect in analogizing the RLA to the NLRA, *Burlington,* 481 U.S. at 448–49, 107 S.Ct. 1841, we note that under the NLRA, employers have several other obligations that fall within the ambit of their duty to bargain in good faith, including, for instance, the duty to disclose relevant data to unions with which they are negotiating, *see, e.g., NLRB v. Pratt & Whitney Air Craft Div., United Techs. Corp.,* 789 F.2d 121, 130–31 (2d Cir.1986). There is no need here to deter-

west simply adheres to the March 1 Agreement and refuses to deal with the AFA in good faith, the AFA may seek an injunction of its own.

## IV. The "Clean Hands" Requirement

■ Finally, the AFA argues that Northwest has not made "every reasonable effort to settle" this dispute, *see* 29 U.S.C. § 108, and thus lacks the requisite "clean hands" to secure an injunction under the NLRA. However, only if a carrier "has failed to take the steps required of it by the Railway Labor Act, . . . [do we forbid it] injunctive relief against the strike of its employees." *Rutland Ry. Corp. v. Bhd. of Locomotive Eng'rs,* 307 F.2d 21, 41 (2d Cir.1962). But as we have already explained, Northwest has, to this point, fulfilled its duties under Section 2 (First). Moreover, because it abrogated the existing CBA under authority of a § 1113 court order, Northwest did not violate either the RLA's explicit status quo provisions or the implicit status quo requirement of Section 2 (First). We have no indication in the record that Northwest is unwilling to return to the NMB, and indeed would expect it to do so. Nor has it sought to short-circuit the RLA's procedures in any other way. *Cf. Toledo, Peoria & W. R.R.,* 321 U.S. at 57, 64 S.Ct. 413.

## CONCLUSION

Although this is a complicated case, one feature is simple enough to describe: Northwest's flight attendants have proven intransigent in the face of Northwest's manifest need to reorganize. On that basis, we conclude that the AFA has violated Section 2 (First) of the RLA and affirm the preliminary injunction.

mine the outer limits of a carrier's duty to

DENNIS JACOBS, Chief Judge, concurring:

I agree with the majority in affirming the preliminary injunction, but I take a different route.

As the majority explains, the Association of Flight Attendants (AFA) has yet to "exert every reasonable effort to make and maintain agreements" as required by 45 U.S.C. § 152 (§ 2 (First)) in light of its failure to exhaust the bargaining procedures of the Railway Labor Act (RLA) and its rejection without good cause of Northwest's proposed modifications to the collective bargaining agreement (CBA).

But does that answer the AFA's argument that Northwest's alteration of the status quo—effected under § 1113 of the Bankruptcy Code—gave the AFA a reciprocal right to strike, without violating its § 2 (First) duty? The AFA argues, with real force, that a strike would not compromise its § 2 (First) duty (or the status quo obligation incorporated therein) if Northwest has already violated its own obligation to the status quo—an obligation that the Supreme Court has strongly implied (if not held) is reciprocal.

The majority sidesteps this argument, holding that once Northwest implemented the terms of the bankruptcy court's § 1113 order, the status quo simply "terminated." Majority Op. at 170. In other words, the status quo—and the protections it offered to the AFA—is said to have terminated when (and because) it was abrogated. I could not possibly explain this to the flight attendants; if I agreed with the majority that Northwest violated a reciprocal duty to maintain the status quo, I would vote to vacate the injunction and permit the AFA to strike.

I vote to affirm nevertheless because, although Northwest effected a change in

bargain in good faith under the RLA.

the status quo, it did not do so *unilaterally*. A debtor-carrier's rejection of a labor agreement in bankruptcy—subject to strict statutory conditions and court oversight—cannot be described fairly as a unilateral divergence from the status quo, and does not trigger a reciprocal right to strike. Northwest's resort to § 1113 therefore did not affect the AFA's § 2 (First) duties, which keep the union at the bargaining table and off the picket line.

## I

We affirm the anti-strike injunction on the basis of the AFA's § 2 (First) duty. Because "the vagueness of the obligation under § 2 (First) could provide a cover for freewheeling judicial interference in labor relations," *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 583, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971), the section is understood to incorporate an "implicit status quo requirement," *see Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 151 & n. 18, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). Given this implicit status quo obligation, strikes are generally inconsistent with exerting every reasonable effort "to settle disputes without interruption to interstate commerce," *id.* at 151, 90 S.Ct. 294. But if a debtor-carrier's resort to § 1113 violates its duty to maintain the status quo, and if that duty is reciprocal, *id.* at 154–55, 90 S.Ct. 294, then a union's strike might be fully consistent with § 2 (First). In my view, then, we cannot avoid deciding the antecedent question whether Northwest violated its duty to maintain the status quo.

\* \* \*

The RLA does not expressly reference a "status quo," yet the Supreme Court has read it to require that "[w]hile the dispute is working its way through the[ ] [RLA's]

stages, neither party may *unilaterally* alter the status quo." *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969) (emphasis added). The obligation is "an affirmative legal duty upon both employers *and unions* alike—which is enforceable by the courts." *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aero. Workers*, 243 F.3d 349, 363 (7th Cir. 2001) (emphasis in original). Only "if the parties exhaust [RLA] procedures and remain at loggerheads, . . . may [they] resort to self-help in attempting to resolve their dispute." *Burlington N. R.R. v. Bhd. of Maint. of Way Employees*, 481 U.S. 429, 445, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987).

Northwest does not seriously dispute that its resort to § 1113 effected a change in the status quo; and, like the majority, I do not endorse the district court's conclusion that the change simply created an "altered baseline," *Northwest Airlines Corp. v. Ass'n of Flight Attendants–CWA (In re Northwest Airlines Corp.)*, 349 B.R. 338, 379 (S.D.N.Y.2006). The question is whether that change was one that violated Northwest's duty to maintain the status quo. *See Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 896–97 (7th Cir.1986) ("[I]t is a difficult question to determine when, if ever, an otherwise legitimate self-help measure begins to impede upon a statutory protection."). The majority evades this question. But that is the question the AFA puts to us, and, as I have explained, we cannot avoid answering it.

The Supreme Court has consistently characterized the duty to maintain the RLA status quo as a duty to avoid changing it "unilaterally." *See Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 306, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989); *Burlington N. R.R.*, 481 U.S. at 449, 107 S.Ct. 1841; *Shore Line*, 396

U.S. at 146–47, 90 S.Ct. 294; *Jacksonville Terminal,* 394 U.S. at 378, 89 S.Ct. 1109. We have preserved that distinction. *See Aircraft Mechanics Fraternal Ass'n v. Atlantic Coast Airlines ("Atlantic Coast II"),* 125 F.3d 41, 41–42 (2d Cir.1997); *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 38–39 (2d Cir. 1990). And our sister circuits have done the same.[1] Avoidance of *unilateral* changes in the status quo is an aspect of the duty to eschew "self-help." *See Shore Line,* 396 U.S. at 154, 90 S.Ct. 294. Unilateral alteration of the status quo is so subversive of the RLA process that it supports injunctive relief without a further showing of irreparable harm. *See Consol. Rail Corp.,* 491 U.S. at 303, 109 S.Ct. 2477.

Northwest did not effect a change in the status quo that is unilateral. A unilateral act is one "in which there is only one party whose will operates." *Black's Law Dictionary* 26 (8th ed.1999). In the context of an RLA status quo, it is an act "without negotiations, without bargaining." *Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe Ry. Co.,* 768 F.2d 914, 920 (7th Cir.1985). The characterization of the status quo duty as a duty to avoid changing it unilaterally prevents self-help, promotes negotiation, and enlists and serves the interest of the public, as set out in *Shore Line:*

> The Act's status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike. In the long run, delaying the time when the parties can

resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout.

396 U.S. at 150, 90 S.Ct. 294.

A debtor-carrier's conduct pursuant to 11 U.S.C. § 1113 cannot fairly be described as unilateral, or as unmoored from negotiations. The procedure is essentially collective bargaining on wheels. Before terminating or altering a labor agreement, a debtor must "make a proposal to the authorized representative of the employees covered by such agreement," which proposal [i] must be "based on the most complete and reliable information available at the time of such proposal," [ii] must "provide[ ] for those necessary modifications in the employee[s'] benefits and protections that are necessary to permit the reorganization of the debtor," and [iii] must "assure[ ] that all creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1113(b)(1)(A). The debtor must then "confer in good faith" with the employees' representative and attempt to "reach mutually satisfactory modifications of such agreement." *Id.* § 1113(b)(2).

Section 1113 thus sets in motion an "expedited form of collective bargaining with several safeguards designed to insure that employers [do] not use Chapter 11 as medicine to rid themselves of corporate indigestion." *Century Brass Prods., Inc. v. United Auto., Aero. & Agric. Implement Workers of Am. (In re Century Brass*

---

1. *See, e.g., Machinist & Aero. Workers,* 243 F.3d at 362; *Atlas Air, Inc. v. Air Line Pilots Ass'n,* 232 F.3d 218, 223 (D.C.Cir.2000); *Int'l Ass'n of Machinists & Aerospace Workers v. Transportes Aereos Mercantiles Pan American-dos, S.A.,* 1005, 1007 (11th Cir.1991); *United Transp. Union v. Black Lick R.R. Co.,* 894 F.2d 623, 628–629 (3d Cir.1990) *Labor Execs. Ass'n*

*v. Chesapeake W. Ry.,* 915 F.2d 116 (4th Cir. 1990); *Div. No. 1, Bhd. of Locomotive Eng'rs v. Consol. Rail Corp.,* 844 F.2d 1218, 1220 n. 1 (6th Cir.1988); *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants,* 809 F.2d 483, 488 (8th Cir.1987); *Int'l Bhd. of Teamsters v. Texas Int'l Airlines, Inc.,* 717 F.2d 157, 159 (5th Cir.1983).

*Prods., Inc.),* 795 F.2d 265, 272 (2d Cir. 1986). Because the bankruptcy court can ultimately order relief, the modifications are constrained in three important ways: they must be necessary to the reorganization, *id.* § 1113(b)(1)(A); the union must have rejected them without good cause, *id.* § 1113(c)(2); and the balance of the equities must favor them, *id.* § 1113(c)(3). Courts enforce these requirements. *See, e.g., Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of Am.,* 791 F.2d 1074, 1094 (3d Cir.1986). In this case, Judge Gropper took exceptional care to assure, notwithstanding the AFA's rejection of Northwest's proposals without good cause, that relief would be limited to those modifications to which the union leadership had once agreed.

An order pursuant to § 1113 is thus implicitly the product of negotiations (successful or unsuccessful). The process

> ensure[s] that well-informed and good faith negotiations occur in the market place, not as part of the judicial process. Reorganization procedures are designed to encourage such a negotiated voluntary modification. Knowing that it cannot turn down an employer's proposal without good cause gives the union an incentive to compromise on modifications of the collective bargaining agreement, so as to prevent its complete rejection. Because the employer has the burden of proving its proposals are necessary, the union is protected from an employer whose proposals may be offered in bad faith.

*N.Y. Typographical Union No. 6 v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.),* 981 F.2d 85, 90 (2d Cir.1992) (citations omitted). I therefore read § 1113 as replacing one-sided modification of a labor agreement with court-approved modification after accelerated negotiation:

> No provision of this title shall be construed to permit a trustee to *unilaterally* terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

11 U.S.C. § 1113(f) (emphasis added); *accord United Steelworkers of Am. v. Unimet Corp. (In re Unimet Corp.),* 842 F.2d 879, 884 (6th Cir.1988) ("[S]ection 1113 unequivocally prohibits the employer from *unilaterally* modifying *any provision* of the collective bargaining agreement.") (emphasis in original). Any other interpretation of § 1113 "would largely, if not completely, undermine whatever benefit the debtor-in-possession otherwise obtains by its authority to request rejection of the agreement." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 529, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). I do not see how the majority can disagree, given its conclusion that a contrary approach would yield "results inconsistent with Congress's intent in passing § 1113." Majority Op. at 172.

Moreover, a debtor-carrier's use of § 1113 is in every sense multilateral: its proposals must "assure[ ] that all creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1113(b)(1)(A). Creditors have important interests to protect in a Chapter 11 proceeding, as emphasized by *amicus curiae* the Official Committee of Unsecured Creditors. The bankruptcy court must keep in view all "affected parties," which in this context includes thousands of other employees, the traveling public, and any commercial entity that uses air carriers to engage in interstate commerce—not to mention whole cities and communities that rely on a single carrier (or few) for transportation by air.

At oral argument, the AFA pointed out that the § 1113 order merely authorized Northwest to act, and that the decision to

act on that authorization was taken by Northwest alone, *i.e.,* unilaterally. This argument cannot be squared with the findings of the bankruptcy court that the modifications were necessary, and no greater than necessary: Northwest's choice was to do what the order allowed, or risk dissolution there and then. As a debtor-in-possession, Northwest might well have violated its fiduciary duty to creditors and the estate had it *not* exercised its right to implement the authorized changes. *See* 11 U.S.C. § 1107(a); *see also In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 169 (Bankr.S.D.N.Y.1990) (The "debtor-in-possession's fiduciary obligation to its creditors includes refraining from acting in a manner which could . . . hinder a successful reorganization of the business."). An act under compulsion does not violate the status quo obligation. *See, e.g., CSX Transp., Inc. v. United Transp. Union,* 86 F.3d 346, 349 (4th Cir.1996) (enjoining strike threatened in response to changes mandated by compulsory arbitration and found necessary by the Interstate Commerce Commission); *Laffey v. Northwest Airlines, Inc.,* 740 F.2d 1071, 1100 (D.C.Cir.1984) (the status quo obligation "does not stop an employer from immediately equalizing wages upward in accordance with a judicial determination that an existing wage disparity violates the Equal Pay Act.").

The majority opinion rejects this approach because the change in the status quo effected by § 1113 is available only to carriers; so if a change pursuant to § 1113 is non-unilateral, the "equal" nature of the status quo obligation would be disturbed. Majority Op. at 172. The status quo obligation's reciprocity certainly leaves the parties "equally restrained," *Shore Line,* 396 U.S. at 155, 90 S.Ct. 294, but the burden it imposes is not equal, and won't be unless Congress sees fit to create a pathway for non-unilateral action by un-

ions akin to § 1113. "[I]t is for the Congress, and not the Courts, to strike the balance between the uncontrolled power of management and labor to further their respective interests" in RLA bargaining. *Jacksonville Terminal,* 394 U.S. at 392, 89 S.Ct. 1109 (internal quotation marks omitted).

I would therefore hold that a debtor-carrier's resort to § 1113 does not work a unilateral alteration of the RLA's status quo and therefore does not violate the debtor-carrier's status quo obligation. Because Northwest did not violate that obligation, the AFA never accrued a right to strike, and a strike would therefore be inconsistent with its § 2 (First) duty to exert all reasonable efforts in pursuit of agreement.

## II

The majority "might well agree" that § 1113 "permits a carrier 'unilaterally' to alter its employees' terms and conditions of employment . . . [and] breach the RLA's status quo provisions," Majority Op. at 171, yet nevertheless rejects the AFA's position that this breach justifies a reciprocal action in the form of a strike. The majority avoids reconciling these positions by holding that once Northwest turned to § 1113, [i] the CBA "ceased to exist," and [ii] the status quo was accordingly "terminated" (and thereby incapable of sustaining a reciprocal right to strike). *Id.* at 170. In my view, the very purpose of the RLA status quo is to perpetuate "rates of pay, rules, or working conditions" *regardless of whether the CBA is terminated.*

The majority would limit the force of the status quo on the basis of 45 U.S.C. § 152 (Seventh), which refers to terms of employment "embodied in agreements." Majority Op. at 173. Yet the Supreme Court has already rejected the argument "that

the 'as embodied in agreements' restriction [of § 152 (Seventh)] should be read into the status quo provisions of §§ 5, 6, and 10." *Shore Line,* 396 U.S. at 155–56, 90 S.Ct. 294.[2] Those sections demonstrate that the protections offered by the reciprocity of the status quo obligation are not coextensive with the underlying agreement: § 5 refers to the status quo as the "rates of pay, rules, or working conditions or established practices *in effect prior to the time to the dispute arose,*" 45 U.S.C. § 155 (First) (emphasis added); § 6 to any "intended change in agreements *affecting* rates of pay, rules, or working conditions," regardless of whether those terms of employment are to be embodied in an agreement, 45 U.S.C. § 156 (emphasis added); and § 10 to "the conditions out of which the dispute arose," 45 U.S.C. § 160.

The majority opinion is the first to hold that the status quo obligation perishes with the underlying agreement. True, the Supreme Court has said that the status quo provisions are inapplicable where no collective bargaining agreement had ever existed between the parties. *See Williams v. Jacksonville Terminal Co.,* 315 U.S. 386, 400–03, 62 S.Ct. 659, 86 L.Ed. 914 (1942). But the Court subsequently limited even this exception; it operates only where (in contrast to our case) "there was absolutely no prior history of any collective bargain-

ing or agreement between the parties on any matter." *Shore Line,* 396 U.S. at 157–58, 90 S.Ct. 294; *see also Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1253 (2d Cir.1992).

Thus, in *Aircraft Mechanics Fraternal Ass'n v. Atlantic Coast Airlines, Inc.* ("*Atlantic Coast I*"), we concluded that a "newly certified union that has no collective bargaining agreement with the carrier is not entitled to a status quo freeze under the [RLA]." 55 F.3d 90, 94 (2d Cir.1995). The holding of *Atlantic Coast I* rested on the fact that no agreement had ever existed between the parties, and, for that reason, the status quo provisions had never applied. There is therefore no basis for the majority's view that an existing status quo can "terminate," and the authorities cited by the majority furnish no support for this idea.[3]

I would not thus discard the status quo provisions in cases involving an abrogated CBA. The status quo obligation is not subject to the horsetrading of collective bargaining; it is superimposed by statute on every labor agreement subject to the RLA, and was thus designed to survive such agreements rather than die with them. *See Manning v. American Airlines, Inc.,* 329 F.2d 32, 34 (2d Cir.1964) ("the very

**2.** As the Court put it, § 152 (Seventh) "simply states one *category* of cases in which [major dispute] procedures must be invoked." *Shore Line,* 396 U.S. at 156, 90 S.Ct. 294 (emphasis added). The dispute between Northwest and the AFA fell into this category once Northwest signaled its intention to change the CBA, long before it had entered Chapter 11 or implemented § 1113 relief.

**3.** The majority says that we have "suggest[ed] that the status quo ceases when an employer rejects a CBA with the approval of a bankruptcy court." Majority Op. at 169 n. 2 (emphasis added). I cannot see how we could have suggested as much, given that nearly all

of the cases cited by the majority had nothing whatsoever to do with the Railway Labor Act or its status quo provisions. The only conceivable exception is *Bhd. of Ry., Airline & S.S. Clerks v. REA Express, Inc.,* which held that a debtor-carrier is "a new juridical entity" and therefore is "not a party to and [is] not bound by the terms of [a] collective bargaining agreement." 523 F.2d 164, 170 (2d Cir.1975). But this holding was repudiated by the Supreme Court, *see Bildisco,* 465 U.S. at 528, 104 S.Ct. 1188, and laid to rest by the enactment of § 1113, *see Air Line Pilots Ass'n, et al. v. Continental Airlines, Inc. (In re Continental Airlines),* 901 F.2d 1259, 1266 n. 6 (5th Cir.1990).

purpose of § 6 is to stabilize relations by artificially extending the lives of agreements for a limited period regardless of the parties' intentions"). Further, § 6 speaks of "an intended change in agreements," see *Shore Line*, 396 U.S. at 158, 90 S.Ct. 294 (citing 45 U.S.C. § 156), which means to me that abrogation of an agreement does *not* void the status quo provisions.

If two parties are reciprocally committed to the terms of an agreement while they bargain over its renewal, can we prevent one from responding to the other's violation solely on the premise that the violation cancelled the agreement itself? The "permanency and continuity" of collective bargaining are what merit the protection of a status quo, see *Williams*, 315 U.S. at 403, 62 S.Ct. 659, and the indicium of an enforceable status quo is whether its terms have been in place "for a sufficient period of time with the knowledge and acquiescence of the employees," *Shore Line*, 396 U.S. at 154, 90 S.Ct. 294. Borrowing the majority's parlance, then, it is the fact that terms of employment are or were "embodied" in an agreement, and not the continuing vitality of that agreement, that triggers the status quo provisions.

The majority focuses on the district court's conclusion that § 1113 established a "new" status quo, and attributes that conclusion to me as well. Majority Op. at 169 n. 2. The scope and terms of the RLA status quo going forward after a debtor-carrier's resort to § 1113 present difficult questions, but not the ones that the parties have asked us to answer. The issue is whether an abrogation of the status quo that was not unilateral—i.e., an abrogation blessed under § 1113—triggered in the union, by reciprocity, the right to strike it sought to exercise.

The majority dilates on whether the CBA was abrogated, breached, modified, partially assumed and partially rejected, or rejected altogether. This misses the point: the CBA between Northwest and its flight attendants is not a private bilateral contract and is therefore not susceptible to such analysis; "[m]ore is involved than the settlement of a private controversy without appreciable consequences to the public." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937). The primary purpose of the RLA is "to avoid any interruption to commerce or to the operation of any carrier engaged therein," 45 U.S.C. § 151a, and its provisions "must be read in [that] light," Air *Cargo Inc. v. Local Union 851, Int'l Bhd. of Teamsters*, 733 F.2d 241, 245 (2d Cir.1984). Labor agreements in the RLA framework are therefore multilateral insofar as they account for the public interest:

> In our complex society, metropolitan areas in particular might suffer a calamity if rail service for freight or for passengers were stopped. Food and other critical supplies might be dangerously curtailed; vital services might be impaired; whole metropolitan communities might be paralyzed.

*Bhd. of Ry. & S.S. Clerks v. Fla. E. Coast Ry. Co.*, 384 U.S. 238, 245, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966).

Accordingly, § 1113 effects non-unilateral abrogation of RLA agreements notwithstanding (or perhaps because of) the union's obstinance. And it does so out of deference to the interests protected by § 1113 and (by incorporation) the RLA: creditors, the carrier's other employees, the flying public, and interstate commerce. The majority rejects my approach as an impermissible "harmonization" of the statutes. Majority Op. at 169 n. 2. No one can accuse the majority of attempting to harmonize the statutes at issue, or of succeeding.

## III

I say the question is whether Northwest abrogated the status quo unilaterally, and would hold that it did not. For the majority, the question is instead whether Northwest abrogated the status quo at all, and the majority says that it did. Under the majority's view, then, it must be that Northwest has "failed to comply with [an] obligation imposed by law which is involved in the labor dispute in question." 29 U.S.C. § 108. This failure to comply is certainly not a good thing; in fact, it means that Northwest would lack "clean hands," and that in turn means that under the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.*, the district court could not enter an anti-strike injunction.

For its part, the majority holds that Northwest has clean hands because it acted "under authority of a § 1113 court order." Majority Op. at 176–77. This sounds right; but the determinative question is whether Northwest has "failed to comply with [an] obligation imposed by law which is involved in [this] labor dispute." If (as I argue) Northwest's obligation was to avoid a *unilateral* change in the status quo, the Norris–LaGuardia Act would not inhibit an injunction. It is hard to see how the majority can conclude that a carrier that unilaterally abrogated the CBA, caused it to go up in smoke, and breached the status quo nevertheless complied with all of the legal obligations involved in this labor dispute. And the fact that a carrier has the "authority" to take an act does not itself vest the carrier with the power to enjoin a strike threatened in response to that act. *See Bhd. of R.R. Trainmen Enter. Lodge, No. 27 v. Toledo, Peoria & W. R.R.*, 321 U.S. 50, 64–65, 64 S.Ct. 413, 88 L.Ed. 534 (1944) (although a carrier has statutory authority to refuse arbitration under 45 U.S.C. § 157 (First), "if it refuses, it loses the legal right to have an injunction issued by a federal court"). The majority's analysis would therefore seem to preclude an anti-strike injunction. Under my analysis, the injunction was properly granted.